# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Shari Guertin, Shari Guertin as next friend of her child, E.B., a minor, and Diogenes Muse-Cleveland,

                    Plaintiffs,

v.

State of Michigan, Richard Snyder, Michigan Department of Environmental Quality, Michigan Department of Health and Human Services, City of Flint, Howard Croft, Michael Glasgow, Darnell Earley, Gerald Ambrose, Liane Scheckter-Smith, Daniel Wyant, Stephen Busch, Patrick Cook, Michael Prysby, Bradley Wurfel, Eden Wells, Nick Lyon, Nancy Peeler, Robert Scott, Veolia North America, LLC, and Lockwood, Andrews & Newman, Inc.,

                    Defendants.

Case No. 16-cv-12412

Judith E. Levy
United States District Judge

Mag. Judge Mona K. Majzoub

_____/

# OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS
## [50, 52, 59, 69, 70, 96, 102, 103, 105]

This is a Flint water case. Plaintiffs Shari Guertin, her minor child E. B., and Diogenes Muse-Cleveland allege that at all relevant times they were residents of Flint, Michigan, where defendants caused the lead in the potable water to rise to dangerous levels and then actively concealed it from residents, causing plaintiffs harm when they consumed and bathed in the water over an extended period of time. Defendants filed motions to dismiss, and the Court held a hearing on March 27, 2017. For the reasons set forth below, each motion is granted in part and denied in part.

## I. Background

Plaintiffs are residents of Flint, Michigan, and allege that defendants are legally responsible for harm that was caused when plaintiffs drank and bathed in water that was contaminated with dangerous levels of lead. (Dkt. 1 at 4-5.)[1] Defendants' main challenges to plaintiffs' complaint are under Rule 12(b)(1) as a facial challenge to subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim, so the following background is drawn from the complaint in the light most

---

[1] Plaintiffs clarified at the hearing on the motions to dismiss that paragraph sixteen of the complaint applies to plaintiff Diogenes Muse-Cleveland. (*See* Dkt. 1 at 5.)

favorable to plaintiffs and accepting all allegations as true. *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

### a. The defendants

Defendant City of Flint is where the relevant harms occurred, and its officials made some of the decisions that ultimately led to plaintiffs' harms. (Dkt. 1 at 5.) Defendant Darnell Earley, Flint's Emergency Manager from November 1, 2013, through January 12, 2015, made the decision "to rush the distribution of water from the Flint River without proper treatment, including corrosion control." (*Id.*) Defendant Earley made the decision to switch to Flint River water and made false and misleading statements representing that the water was safe to drink, even after he became aware that it was not. (*Id.* at 7-8.)

Defendant Howard Croft, Flint's Department of Public Works Director, and defendant Michael Glasgow, a water treatment plant operator for Flint, knew that Flint's water treatment plant was inadequate, and nonetheless caused and allowed unsafe water to be delivered to Flint's residents and did not disclose that Flint's water was unsafe. (*Id.* at 6-7.) Defendant Croft also made a number of false

statements about the safety and quality of Flint's water that he knew to be untrue. (*Id.* at 6.)

Defendant State of Michigan directs, controls, and operates defendants Michigan Department of Environmental Quality ("MDEQ") and Michigan Department of Health and Human Services ("MDHHS"). (*Id.* at 7.) Defendant Richard Snyder, as Governor of Michigan, participated in, directed, and facilitated the state's decision to transition Flint's water source to the Flint River, and participated in, directed, and facilitated the state's insufficient response to protect plaintiffs from defendant State of Michigan's actions. (*Id.*)

Defendant Gerald Ambrose, Flint's Emergency Manager from January 13, 2015, until April 28, 2015, and a financial advisor regarding Flint's financial emergency from January 2012 until December 2014, was involved in and directed the state's decision to transition Flint to Flint River water, and made false and misleading statements representing that the water was safe to drink. (*Id.* at 7-8.)

Defendant MDEQ is the state agency responsible for implementing safe drinking water laws, rules, and regulations in Michigan. Defendant MDEQ, through its employees, violated the federal Lead and Copper Rule

by failing to require corrosion control for Flint River water, misled the federal Environmental Protection Agency ("EPA"), conducted illegal and improper sampling of Flint's water, lied to the public about the safety of Flint's water, and attempted to publicly discredit outside individuals who offered independent evidence of the water's contamination. (*Id.* at 8-9.) These defendants ignored voluminous evidence of the crisis they had created until the point when their denials could no longer withstand outside scrutiny. (*Id.* at 9.)

Defendant Liane Shekter Smith,[2] Chief of the Office of Drinking Water and Municipal Assistance for MDEQ until she was removed from her position on October 19, 2015, knowingly participated in, approved of, and caused the decision to transition to Flint River water, and knowingly disseminated false statements to the public that the water was safe to drink, leading to the continued consumption of lead-contaminated water. (*Id.*)

Defendant Daniel Wyant, the Director of MDEQ until his resignation on or about December 29, 2015, participated in, directed, and

_____

[2] Plaintiffs incorrectly spelled defendant Liane Shekter Smith's name as "Liane Sheckter-Smith" in the case caption, but the Court uses the correct spelling of her name in this opinion and order.

oversaw defendant MDEQ's repeated violations of federal water quality laws, failure to properly study and treat Flint River water, and defendant MDEQ's systemic denial, lies, and attempts to discredit outside observers who were publicly reporting that the water in Flint contained dangerous levels of lead. (*Id.*) He knowingly disseminated false statements to the public that led to the continued consumption of lead-contaminated water. (*Id.* at 9-10.)

Defendant Stephen Busch, the District Supervisor assigned to the Lansing District Office of defendant MDEQ, participated in MDEQ's repeated violations of federal water quality laws, the failure to properly study and treat Flint River water, and defendant MDEQ's program of systemic denials, lies, and attempts to discredit honest outsiders. (*Id.* at 10.) He personally falsely reported to the EPA that Flint had enacted an optimized corrosion control plan and provided assurances to plaintiffs that the water was safe to drink when he knew that such assurances were false. (*Id.*)

Defendant Patrick Cook, the Water Treatment Specialist assigned to the Lansing Community Drinking Water Unit of defendant MDEQ, participated in, approved, and assented to the decision to allow Flint's

water to be delivered to residents without corrosion control or proper study or testing. (*Id.* at 10-11.)

Defendant Michael Prysby, the Engineer assigned to District 11 (Genesee County) of MDEQ, participated in, approved, and assented to the decision to switch the water source, failed to properly monitor or test the Flint River water, and provided assurances to plaintiffs that the Flint River water was safe when he knew those statements to be untrue. (*Id.* at 11.)

Defendant Bradley Wurfel, the Director of Communications for MDEQ until he resigned on December 29, 2015, repeatedly denied the water situation as it unfolded and attempted to discredit opposing opinions. (*Id.* at 11-12.) He repeatedly made public statements that created, increased, and prolonged the risks and harms facing plaintiffs, which he knew were false. (*Id.* at 12.) He was eventually relieved of his duties for his "persistent [negative] tone and derision" and his "aggressive dismissal, belittlement and attempts to discredit the individuals involved in [conducting independent studies and tests]." (*Id.*)

Defendant MDHHS, through decision-making employees, deliberately hid information that would have revealed the public health

crisis in Flint, which MDHHS had earlier failed to detect. (*Id.*)
MDHHS's failure to properly analyze data led it to conclude that there
was no increase in lead contamination in Flint's children, and MDHHS
resisted and obstructed the efforts of outside researchers and the county
health department to determine whether that was actually true and
correct. (*Id.*)

Defendants Eden Wells, Chief Medical Executive within the
Population Health and Community Services Department of MDHHS,
Nick Lyon, Director of MDHHS, and Nancy Peeler, an MDHHS employee
in charge of its childhood lead poisoning prevention program,
participated in, directed, and oversaw the Department's efforts to hide
information to save face and to obstruct the efforts of outside researchers.
(*Id.* at 12-13.) Defendants Wells and Lyon knew as early as 2014 of
problems with lead and legionella contamination in Flint's water and
participated in hiding this information. (*Id.* at 12-13.) And defendant
Peeler continued to try to generate evidence that there was no lead
contamination problem even when her own Department had data that
verified outside evidence to the contrary. (*Id.* at 13.)

Defendant Robert Scott, at all relevant times Data Manager for MDHHS's Healthy Homes and Lead Prevention Program, also participated in, directed, and oversaw the Department's efforts to hide information to save face and actively sought to obstruct and discredit the efforts of outside researchers. (*Id.* at 14.) And he continued to try to generate evidence that there was no lead contamination problem even when his own Department had data that verified outside evidence to the contrary. (*Id.*) He served a key role in withholding and delaying disclosure of data that outside researchers needed to conduct independent research. (*Id.*)

Defendant Veolia North America, LLC, a Delaware corporation with its principal office in Illinois, provided negligent professional engineering services in reviewing Flint's water system and declaring the water safe to drink. (*Id.* at 14-15.) Defendant Lockwood, Andrews & Newnam, Inc., a Texas corporation with its principal office in Texas, provided negligent professional engineering services in preparing Flint's water treatment facility to treat water from the Flint River. (*Id.* at 15.)

### b. The events

Under the federal Safe Drinking Water Act, the EPA is responsible for setting rules regulating drinking water, including the Lead and Copper Rule. (*Id.*) Put simply, the law requires sampling of public water systems, and when results indicate that lead is present at levels that exceed the lead action level set in the Lead and Copper Rule, water systems are required to notify the public, the state, and the EPA of the lead action level "exceedance." When the levels have the potential to cause serious adverse health effects from short-term exposure, the water system must issue the notifications within twenty-four hours. *See* 42 U.S.C. § 300g-3(c)(2)(C); 40 C.F.R. § 141.80(c).

In 2010, the EPA commissioned a report noting, among other things, that defendant MDEQ's practice of calculating the amount of lead in water "does not meet the requirements of Federal Regulations, since it is required that all 90th percentiles be calculated," something MDEQ would not do unless a potential violation had been identified. (Dkt. 1 at 18.) The report also noted that MDEQ did not conduct the required number of water samples for lead. (*Id.*) Defendant MDEQ also violated "the letter and spirit" of the Lead and Copper Rule by failing to require

corrosion control for Flint River water and by misinforming the EPA about whether corrosion control was being utilized. (*Id.* at 19.) MDEQ's former director "explicitly admitted" that the state agency did not follow the rule. (*Id.* at 20.)

In November 2012, Flint's Emergency Manager suggested joining the Karegnondi Water Authority to save costs. (*Id.*) On March 7, 2014, defendant Earley sent a letter to the Detroit Water and Sewerage Department from which Flint had been receiving its water supply, stating "[w]e expect that the Flint Water Treatment Plant will be fully operational and capable of treating Flint River water prior to the date of termination. In that case, there will be no need for Flint to continue purchasing water to serve its residents and businesses after April 17, 2014." (*Id.* at 21.) On March 26, 2014, defendant Busch e-mailed defendant Shekter Smith and another colleague stating that starting up the Flint plant "for continuous operation will carry significant changes in regulatory requirements so there is a very gray area as to what we consider for startup." (*Id.* at 22.)

However, defendant Glasgow informed defendant MDEQ on April 17, 2014, that he "assumed there would be dramatic changes to [MDEQ's]

monitoring" and did "not anticipate giving the OK to begin sending water out anytime soon. If water is distributed from this plant in the next couple of weeks, it w[ould] be against [his] direction. [He] need[ed] time to adequately train additional staff and to update [MDEQ's] monitoring plans before [he would] feel [MDEQ was] ready." (*Id.* at 22.) According to Glasgow, "management above" seemed "to have their own agenda." (*Id.*)

On April 25, 2014, Flint officially began using the Flint River as its primary water source, despite the fact that the proper preparations had not been made and defendant Glasgow's clear warning to the contrary. (*Id.* at 23.) Defendant Croft stated in a press release that "[t]he test results have shown that our water is not only safe, but of the high quality that Flint customers have come to expect." (*Id.*)

When Flint was receiving its water from the Detroit Water and Sewerage Department, it was already treated to prevent corrosion, but the water from the Flint River was not. (*Id.* at 24.) Defendant Lockwood was hired to make Flint's plant sufficient to treat water from its new source. (*Id.*) Defendants State of Michigan, MDEQ, and Lockwood did not implement any corrosion control for the new water source, which it

required due to the lead pipes in Flint's water system. (*Id.* at 24-26.) Defendants were put on notice that this was an issue when residents of Flint began complaining almost immediately about discoloration and odor, among other things. (*Id.* at 26.)

In August and September 2014, Flint issued two boil-water advisories after fecal coliform bacteria was discovered in the water. (*Id.* at 27.) On October 13, 2014, General Motors ceased using Flint River water at its engine plant because the company determined that high levels of chloride would corrode its car parts. Discussing General Motors' decision, defendant Prysby wrote to defendants Busch, Shekter Smith, and others that the Flint River water had elevated chloride levels that "although not optimal" were "satisfactory." (*Id.* at 28.) He "stressed the importance of not branding Flint's water as 'corrosive' from a public health standpoint simply because it does not meet a manufacturing facility's limit for production." (*Id.*)

In October of 2014, defendant Snyder received a briefing in which officials blamed iron pipes, susceptible to corrosion and bacteria, for the two boil-water advisories. (*Id.*) On January 2, 2015, Flint mailed a notice to its water customers indicating that the city had been in violation of the

Safe Drinking Water Act due to the presence of trihalomethanes, which was a result of attempts to disinfect the water. (*Id.*) And on January 9, 2015, the University of Michigan–Flint discovered lead in the water coming out of campus drinking fountains. (*Id.*)

As early as January 2015, defendant State of Michigan began providing purified water coolers at its Flint offices for state employees in response to concerns about the drinking water, while government officials, including many defendants, continued to tell Flint residents that the water was safe to drink. (*Id.*) On January 12, 2015, the Detroit Water and Sewerage Department offered to waive a four-million dollar reconnection fee to transition Flint back to water provided by the Detroit Water and Sewerage Department. Defendant Ambrose, as Emergency Manager, declined the offer. (*Id.*)

On January 29, 2015, defendant Shekter Smith emailed MDEQ deputy director Jim Sygo that a "change in water chemistry can sometimes cause more corrosive water to slough material off of pipes as opposed to depositing material or coating pipes in the distribution system," and that this "may continue for a while until things stabilize."

(*Id.* at 29.) She noted that because "it appears wide-spread, it's most likely a distribution system problem." (*Id.*)

On February 6, 2015, an Emergency Manager staff member wrote to defendant Prysby, asking whether he knew if defendant MDEQ had ever conducted a "source water assessment" for the Flint River. (*Id.*) After an initial response stating that he did not know, Prysby later responded that a study on the Flint River as an emergency intake had been conducted in 2004. The 2004 study noted that the Flint River was a highly sensitive drinking water source susceptible to contamination. (*Id.*)

On February 27, 2015, in response to concerns about dangerously high levels of lead in a resident's water sample, defendant Busch told the EPA on behalf of defendant MDEQ that the Flint Water Treatment Plant had an optimized corrosion control program, despite knowing it did not. (*Id.*) In an email to defendants Prysby and Busch, the EPA's regional drinking water regulations manager Miguel Del Toral noted high levels of particulate lead in the water sample, and inquired about optimized corrosion control. (*Id.* at 30.) He relayed that defendant MDEQ's testing method—flushing the line before compliance sampling—impermissibly

skewed the test results to show fewer lead particles than were generally present. (*Id.*)

During this time, an email from an employee in defendant MDEQ noted that the switch to the Flint River "put the city in the business of water production, where they had historically been in the business of water transmission," stating that "once the city connects to the new KWA system in 2016, this issue w[ould] fade into the rearview." (*Id.* at 31.) Also during this time, defendant Veolia was hired to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken. (*Id.*) Veolia issued an interim report on February 18, 2015, stating that Flint's water was "in compliance with drinking water standards," and noting that "[s]afe [meant] complian[t] with state and federal standards and required testing." (*Id.*) Veolia dismissed medical concerns by stating that "[s]ome people may be sensitive to any water." (*Id.* at 32.)

Defendant Veolia issued its final report on March 12, 2015, stating that "a review of water quality records for the time period under our study indicates compliance with State and Federal water quality

regulations." (*Id.*)  Veolia recommended that adding polyphosphate to the water would minimize discoloration.  (*Id.*)

On April 24, 2015, defendant MDEQ stated to the EPA that Flint did not have optimized corrosion control in place, contradicting MDEQ's previous statement made two months prior.  (*Id.* at 33.)  That same month, EPA regional drinking water manager Del Toral issued a memorandum to the MDEQ, stating:

> I wanted to follow up on this because Flint has essentially not been using any corrosion control treatment since April 30, 2014, and they have (lead service lines).  Given the very high lead levels found at one home and the pre-flushing happening in Flint, I'm worried that the whole town may have much higher lead levels than the compliance results indicated, since they are using pre-flushing ahead of their compliance sampling.

(*Id.* at 34.)  On May 1, 2015, defendant Cook responded that "[a]s Flint will be switching raw water sources in just over one year from now, raw water quality will be completely different than what they currently use. Requiring a study at the current time will be of little to no value in the long term control of these chronic contaminants."  (*Id.* at 35.)

On June 24, 2015, Del Toral sent a memorandum to the chief of the EPA's Region 5 Ground Water and Drinking Water Branch, and included

on the email defendants Shekter Smith, Cook, Busch, and Prysby.  (*Id.*
at 35-36.)  He expressed concern at the lead levels and lack of mitigating
treatment, detailing Lee-Anne Walters' experience.  Walters had
contacted the EPA with the lead-level results in her potable water, which
defendant MDEQ had told her was coming from the plumbing in her own
home.  (*Id.* at 36.)  Del Toral's inspection revealed that her plumbing was
entirely plastic and noted that blood tests showed her child had elevated
blood lead levels.  (*Id.*)

On July 9, 2015, ACLU-Michigan reporter Curt Guyette publicly
broke the story about lead in Flint's drinking water, citing Del Toral's
Memorandum and exposing the lack of corrosion control in Flint's
drinking water.  Defendant Wurfel responded:  "Let me start here—
anyone who is concerned about lead in the drinking water in Flint can
relax."  (*Id.* at 38.)

On August 27, 2015, Virginia Tech Professor Marc Edwards
released an analysis of lead levels in homes he sampled in Flint.  More
than half of the samples came back above 5 parts-per-billion, and more
than 30% of them came back over 15 ppb, which would be unacceptable
even at the 90th percentile.  (*Id.* at 40-41.)  In September 2015, Professor

Edwards published a report of his findings. (*Id.* at 42-43.) Defendant Wurfel made a number of statements to qualify, distinguish, or otherwise downplay these results. (*Id.* at 41-42, 43-44.)

On September 17, 2015, defendant Wyant wrote a letter in response to an inquiry from various legislators, stating that "the MDEQ does not review or receive draft memos from the USEPA, nor would we expect to while it is a draft," despite the memorandum it had received months earlier from Del Toral. (*Id.* at 46.) On September 23, 2015, defendant Croft sent an email to numerous officials stating that "Flint has officially returned to compliance with the Michigan Safe Drinking Water Act," recent "testing has raised questions regarding the amount of lead that is being found in the water," and "over one hundred and sixty lead tests [have been performed] throughout the city since switching over to the Flint River and remain within EPA standards." (*Id.*)

On July 28, 2015, MDHHS epidemiologist Cristin Larder emailed defendant Peeler and MDHHS employee Patricia McKane, noting an increase in blood lead levels in Flint residents just after the switch and concluding that the issue "warrant[ed] further investigation." (*Id.* at 48.)

Defendant Peeler responded by attributing the increase to seasonal variation. (*Id.*)

On September 24, 2015, Dr. Hanna-Attisha presented the results from her study at a press conference, which showed post-water transition elevation of blood-lead levels in Flint children. (*Id.* at 50.) MDHHS employees "were uniformly dismissive of Dr. Hanna-Attisha's results." (*Id.*) But the day after Dr. Hanna-Attisha released her study, the City of Flint issued a health advisory, telling residents to flush pipes and install filters to prevent lead poisoning. (*Id.* at 51.)

On September 28, 2015, defendant Wurfel publicly stated that he "wouldn't call [Dr. Hanna-Attisha's statements] irresponsible. [He] would call them unfortunate." And he again declared Flint's water safe to drink. (*Id.* at 53.) The same day, defendant Lyon stated that he "would like to make a strong statement with a demonstration of proof that the lead blood levels seen are not out of the ordinary and are attributable to seasonal fluctuations." (*Id.* at 54.)

Plaintiffs cite numerous inter- and intra-department communications, alleging they show attempts to cover up the issue. (*Id.* at 54-58.) By October 12, 2015, defendant Snyder received a proposal to

reconnect Flint to the Detroit Water and Sewerage Department. And on October 16, 2015, Flint reconnected to the Detroit Water and Sewerage Department. This did not change the corrosion that had already occurred, and lead has continued to leach from pipes into the water. (*Id.* at 58.)

> On October 18, 2015, defendant Wyant stated to defendant Snyder:
>
> [S]taff made a mistake while working with the City of Flint. Simply stated, staff employed a federal (corrosion control) treatment protocol they believed was appropriate, and it was not. . . . I believe now we made a mistake. For communities with a population above 50,000, optimized corrosion control should have been required from the beginning. Because of what I have learned, I will be announcing a change in leadership in our drinking water program.

(*Id.* at 58-59.)

On October 21, 2015, defendant Snyder appointed a task force to investigate the Flint water crisis. (*Id.* at 59.) On December 29, 2015, the task force issued a letter detailing its findings: "Although many individuals and entities at state and local levels contributed to creating and prolonging the problem," the "primary responsibility for what happened in Flint rests with the [MDEQ]. . . . It failed in that responsibility and must be held accountable for that failure." (*Id.* at 59-

60.) Among other things, the task force found that "the agency's response was often one of aggressive dismissal, belittlement, and attempts to discredit [outside, independent] efforts and the individuals involved," and "the MDEQ seems to have been more determined to discredit the work of others—who ultimately proved to be right—than to pursue its own oversight responsibility." (*Id.* at 60.) The task force stated "we are particularly concerned by recent revelations of MDHHS's apparent early knowledge of, yet silence about, elevated blood lead levels detected among Flint's children." (*Id.* at 61.)

In October 2015, defendant Shekter Smith was reassigned so as to have no continued oversight responsibility regarding Flint's drinking water. On December 5, 2015, the City of Flint declared a state of emergency. On December 23, 2015, the Michigan Auditor General provided an investigative report on the crisis, finding that corrosion control should have been maintained from the beginning and that improper sample sites had been selected by defendant MDEQ. On December 30, 2015, defendants Wyant and Wurfel resigned. (*Id.*) On January 4, 2016, Genesee County declared its own state of emergency. (*Id.* at 62.)

On January 21, 2016, Susan Hedman, former EPA Region 5 Administrator, resigned over her involvement in the Flint Water crisis.[3] That same day, the EPA issued an Emergency Order, based on its finding that "the City of Flint's and the State of Michigan's responses to the drinking water crisis in Flint have been inadequate to protect public health and that these failures continue." (*Id.* at 62.) At one of the several hearings conducted before the U.S. Congress, the EPA Deputy Assistant Administrator testified:

> [Defendant] MDEQ incorrectly advised the City of Flint that corrosion-control treatment was not necessary, resulting in leaching of lead into the city's drinking water . . . . EPA regional staff urged MDEQ to address the lack of corrosion control, but was met with resistance. The delays in implementing the actions needed to treat the drinking water and in informing the public of ongoing health risks raise very serious concerns.

(*Id.* at 64.)

---

[3] In paragraph forty-three, plaintiffs state that Hedman could not yet be named as a defendant pursuant to the Federal Tort Claims Act, but that if their anticipated FTCA claims to the EPA were rejected, they might seek to amend their complaint in order to add claims against Hedman. (Dkt. 1 at 14.) Plaintiffs clarified at the hearing that this was a drafting mistake; plaintiffs have not filed an FTCA administrative claim, and they have otherwise taken no action to bring suit against Hedman, nor do they intend to.

On January 22, 2016, defendants Shekter Smith and Busch were suspended without pay. Defendant Shekter Smith's firing was announced on February 5, 2016. (*Id.* at 63.)

### c. Plaintiffs' claims

Plaintiffs bring fifteen claims. In Count 1—against defendants City of Flint, Croft, Glasgow, State of Michigan, Snyder, Earley, Ambrose, MDEQ, Shekter Smith, Wyant, Busch, Cook, Prysby, and Wurfel— plaintiffs bring a 42 U.S.C. § 1983 claim, alleging a deprivation of a contractually created property right in violation of substantive due process. According to plaintiffs, these defendants violated their property right "when, ceasing to provide [p]laintiffs with safe, potable water, they provided [p]laintiffs with poisonous, contaminated water." (*Id.* at 64-65.)

In Count 2— against defendants City of Flint, Croft, Glasgow, State of Michigan, Snyder, Earley, Ambrose, MDEQ, Shekter Smith, Wyant, Busch, Cook, Prysby, and Wurfel—plaintiffs bring a § 1983 claim, alleging a deprivation of a contractually created property right in violation of procedural due process. According to plaintiffs, these defendants deprived them of their contractually based property right to

purchase and receive safe, potable drinking water without notice or a hearing. (*Id.* at 65-66.)

In Count 3—against defendants City of Flint, Croft, Glasgow, State of Michigan, Snyder, Earley, Ambrose, MDEQ, MDHHS, Shekter Smith, Wyant, Busch, Cook, Prysby, Wurfel, Wells, Peeler, Lyon, and Scott, *i.e.*, all defendants except Veolia and Lockwood—plaintiffs bring a § 1983 claim, alleging a state-created danger in violation of substantive due process. According to plaintiffs, these defendants each acted to expose them to toxic, lead-contaminated water by making, causing to be made, and/or causing or making representations that the water was safe to drink, and these actions and omissions were objectively unreasonable in light of the facts and circumstances confronting them, in violation of plaintiffs' Fourteenth Amendment rights. (*Id.* at 66-68.)

In Count 4—against defendants City of Flint, Croft, Glasgow, State of Michigan, Snyder, Earley, Ambrose, MDEQ, MDHHS, Shekter Smith, Wyant, Busch, Cook, Prysby, Wurfel, Wells, Peeler, Lyon, and Scott, *i.e.*, all defendants except Veolia and Lockwood—plaintiffs bring a § 1983 claim, alleging a violation of their substantive due process right to bodily integrity. According to plaintiffs, these defendants caused their harm by

exposing them to lead-contaminated water and otherwise hiding the contamination from them, and as a result, plaintiffs suffered bodily harm and their rights to bodily integrity were violated. (*Id.* at 68-70.)

In Count 5—against defendants City of Flint and State of Michigan—plaintiffs allege a breach of contract. According to plaintiffs, these defendants offered to sell potable water, plaintiffs agreed to pay for potable water, and these defendants materially and irreparably breached the contract with plaintiffs by failing to provide potable, safe drinking water. (*Id.* at 70-71.)

In Count 6—against defendants City of Flint and State of Michigan—plaintiffs allege a breach of implied warranty. According to plaintiffs, these defendants directly promised to provide water that was fit for human consumption and/or impliedly promised that the water was fit for human consumption, and did not. (*Id.* at 71-72.)

In Count 7—against all defendants—plaintiffs allege a nuisance. According to plaintiffs, defendant caused foul, poisonous, lead-contaminated water to be delivered to their homes, resulting in the presence of contaminants in their properties and persons, and

substantially and unreasonably interfering with their comfortable living and ability to use and enjoy their homes. (*Id.* at 72-73.)

In Count 8—against all defendants—plaintiffs allege a trespass. According to plaintiffs, defendants' negligent, grossly negligent, willful, and wanton conduct and failures to act caused contaminants to enter plaintiffs' property. (*Id.* at 74-75.)

In Count 9—against defendants City of Flint and State of Michigan—plaintiffs allege unjust enrichment. According to plaintiffs, these defendants received and retained the benefits of the funds paid by plaintiffs for contaminated water that was and is unfit for human consumption. (*Id.* at 75.)

In Count 10, plaintiffs allege negligence/professional negligence/ gross negligence against defendant Veolia. According to plaintiffs, Veolia undertook, for consideration, to render services that it should have recognized as necessary for the protection of plaintiffs and their property, thus creating a duty to plaintiffs to exercise reasonable care to protect that undertaking; plaintiffs relied on Veolia to perform its duty; Veolia breached its duty; and plaintiffs were directly and proximately harmed by Veolia's breach. (*Id.* at 75-78.)

In Count 11, plaintiffs allege negligence/professional negligence/ gross negligence against defendant Lockwood. According to plaintiffs, Lockwood undertook, for consideration, to render services that it should have recognized as necessary for the protection of plaintiffs and/or their property, thus creating a duty to plaintiffs to exercise reasonable care to protect that undertaking; plaintiffs relied on Lockwood to perform its duty; Lockwood breached its duty; and plaintiffs were directly and proximately harmed by Lockwood's breach. (*Id.* at 78-79.)

In Count 12—against defendants Snyder, Croft, Glasgow, Earley, Ambrose, Shekter Smith, Wyant, Busch, Cook, Prysby, Wurfel, Wells, Peeler, and Scott—plaintiffs allege gross negligence. According to plaintiffs, these defendants owed plaintiffs an independent duty of care, breached the duty of care, and plaintiffs suffered harm. (*Id.* at 80-83.)

In Count 13—against defendants Snyder, Croft, Glasgow, Earley, Ambrose, Shekter Smith, Wyant, Busch, Cook, Prysby, Wurfel, Wells, Peeler, and Scott—plaintiffs allege intentional infliction of emotional distress. According to plaintiffs, these defendants' outrageous conduct was intentional and reckless, in conscious disregard for the rights and

safety of plaintiffs, and caused, prolonged, and obscured plaintiffs' exposure to lead-contaminated water. (*Id.* at 82-83.)

In Count 14—against defendants Snyder, Croft, Glasgow, Earley, Ambrose, Shekter Smith, Wyant, Busch, Cook, Prysby, Wurfel, Wells, Peeler, and Scott—plaintiffs allege negligent infliction of emotional distress. According to plaintiffs, these defendants were in a special relationship to them, being charged with providing them safe water, the distress they caused from plaintiffs suffering and having to see family members suffer from lead exposure was highly foreseeable, and defendants' negligent acts caused plaintiffs and their loved ones harm. (*Id.* at 83-85.)

In Count 15—against defendants Snyder, Croft, Glasgow, Earley, Ambrose, Shekter Smith, Wyant, Busch, Cook, Prysby, Wurfel, Wells, Peeler, and Scott—plaintiffs allege that these defendants engaged in proprietary functions when selling potable water to plaintiffs, *i.e.*, to produce a pecuniary profit for the governmental agencies, not supported by taxes and fees, and thus these defendants do not get governmental immunity. (*Id.* at 85-87.)

Plaintiffs seek an order declaring defendants' conduct unconstitutional; an order of equitable relief to remediate the harm caused by defendants' unconstitutional conduct including repairs to property, establishment of a medical monitoring fund, and appointing a monitor to oversee the water operations of Flint for a period of time deemed appropriate by the court; an order for an award for general damages; an order for an award of compensatory damages; an order for an award of punitive damages; an order for an award of actual reasonable attorney fees and litigation expenses; and an order for all such other relief the court deems equitable. (*Id.* at 88.)

## II. Standard

### a. Rule 12(b)(1)

"Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Relevant here, "[a] facial attack is a challenge to the sufficiency of the pleading itself." *Id.* (emphasis in original). When considering a facial attack, "the court must take the material allegations of the [complaint] as true and construed in the light most favorable to the nonmoving party." *Id.*

To survive such an attack, "the plaintiff's burden to prove federal question subject matter jurisdiction is not onerous." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996) (citing *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996)). "The plaintiff must show only that the complaint alleges a claim under federal law, and that the claim is 'substantial.'" *Id.* "[T]he plaintiff can survive the motion by showing any arguable basis in law for the claim made." *Id.* "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of [the Supreme Court], or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of New York v. Cty. of Oneida*, 414 U.S. 661, 666 (1974)).

### b. Rule 12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir. 2012). "To

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## III. Analysis

Because defendants challenge the sufficiency of plaintiffs' complaint on both subject-matter jurisdiction and sufficiency-of-the pleadings grounds, the Court first addresses defendants' jurisdictional arguments.

### a. Whether the Court has subject-matter jurisdiction

### i. Standing

Defendants Lockwood and Scott argue that plaintiffs fail to establish Article III standing, and thus the complaint should be dismissed under Rule 12(b)(1). (*See, e.g.*, Dkt. 59 at 15-16; *see* Dkt. 96 at 49.) Specifically, they argue that plaintiffs only plead they were "'damaged' or 'injured' in some unspecified way," and that failing to plead that "their blood lead levels are even elevated, just that they were

exposed to lead-contaminated water," is insufficient to plead a concrete injury. (*See, e.g.*, Dkt. 59 at 16-17.)

This argument is frivolous. At the beginning of the complaint, plaintiffs allege that they all consumed lead-conftaminated water, that the water was contaminated with lead because of defendants' actions, and that they suffered injuries including hair, skin, digestive, and organ problems; physical pain and suffering; disability; brain and developmental injuries including cognitive deficits; and aggravation of pre-existing conditions. (Dkt. 1 at 4-5.) There is no question that plaintiffs sufficiently pleaded a "concrete and particularized" injury, they "suffered an injury in fact," there is "a causal connection between the injury and the conduct complained of," and a favorable decision from this Court would likely redress plaintiffs' injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Accordingly, the motions to dismiss based on plaintiffs' failure to plead a concrete injury is denied.

### ii. Preemption

Defendants against whom the four § 1983 claims are made—all defendants except for Veolia and Lockwood—argue that the federal Safe Drinking Water Act ("SDWA" or "Act") has a comprehensive remedial

scheme that preempts plaintiffs' federal claims. (*See* Dkts. 52 at 17, 69 at 25, 70 at 24, 96 at 25, 102 at 35, 103 at 23, 105 at 15.)

Plaintiffs allege that the state violated their substantive and procedural due process rights to property created by a contract for water with the city and state, their substantive due process right to be free from a state-created danger, and their substantive due process right to bodily integrity. According to defendants, the SDWA provides the exclusive remedy for claims based on unsafe public drinking water. (*See, e.g.*, Dkt. 103 at 24.) They argue that the Act's remedial scheme is so comprehensive that Congress intended the Act to preempt all other federal remedies, including constitutional claims brought under § 1983.

Plaintiffs respond that defendants apply the wrong preemption analysis, that which applies to § 1983 claims for federal *statutory* violations, but the correct test here is that which applies to § 1983 claims for violations of the Constitution. (*See* Dkt. 123 at 24.) Plaintiffs argue that because the contours of the rights afforded under the Constitution are substantially different from those under the SDWA, Congress did not intend the enforcement scheme in the SDWA to displace constitutional claims under § 1983. (*Id.* at 24-31.)

When Congress intends a statute's remedial scheme to "be the exclusive avenue through which a plaintiff may assert [the] claims," § 1983 claims are precluded. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 252 (2009) (quoting *Smith v. Robinson*, 468 U.S. 992, 1009 (1984)). And when, as here, a § 1983 claim is based on a constitutional right, "lack of congressional intent may be inferred from a comparison of the rights and protections of the statute and those existing under the Constitution." *Id.* When "the contours of such rights and protections diverge in significant ways, it is not likely that Congress intended to displace § 1983 suits enforcing constitutional rights." *Id.*

Among the several Supreme Court cases that have addressed the issue, this case is in line with those finding that the federal statute does not preempt § 1983 claims for violations of the Constitution.

In *Smith v. Robinson*, the Supreme Court held that the Education of the Handicapped Act preempted § 1983 due process and equal protection claims because Congress had placed "on local and state educational agencies the primary responsibility for developing a plan to accommodate the needs of each individual handicapped child," and "the procedures and guarantees set out in the [statute]" were

"comprehensive." 468 U.S. 992, 1011 (1984). In light "of the comprehensive nature of the procedures and guarantees set out in" that statute, the Court found "it difficult to believe that Congress also meant to leave undisturbed the ability of a handicapped child to go directly to court with an equal protection claim to a free appropriate public education." *Id.*

And in *Rancho Palos Verdes v. Abrams*, the Court similarly held that the Telecommunications Act's detailed and restrictive administrative and judicial remedies "are deliberate and are not to be evaded through § 1983." 544 U.S. 113, 124 (2005). In both cases, "the statutes at issue required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies," and a direct route to court through § 1983 "would have circumvented these procedures and given plaintiffs access to tangible benefits—such as damages, attorney's fees, and costs—that were unavailable under the statutes." *Fitzgerald*, 555 U.S. at 254.

In contrast, the Supreme Court held in *Fitzgerald* that the relief available under Title IX—withdrawal of federal funding from institutions not in compliance with the law and an implied right of action permitting

injunctive relief and damages—was evidence that Congress did not intend to preempt § 1983 claims based on violations of the Equal Protection Clause. *Id.* at 255. The Court noted that "we should 'not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a substantial equal protection claim,'" and declined to do so as to Title IX in light of the fact that there was only an implied remedy under the statute and because of the "divergent coverage of Title IX and the Equal Protection Clause." *Id.* at 255-58.

Under the SDWA, the states are charged with "primary enforcement responsibility." *See* 42 U.S.C. § 300g-2. And the Administrator of the EPA can sue in federal court for civil penalties of up to $25,000 for each day in which the statute or regulations are violated. *Id.* at § 300g-3.

There is a citizen-suit provision as well. "[A]ny person may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of any requirement prescribed by or under" the Act. 42 U.S.C. § 300j-8(a)(1). District courts have jurisdiction "to enforce in an action brought under this subsection any requirement prescribed by or under this title or to order the Administrator to perform

an act" that is non-discretionary. *Id.* at (a)(1)-(2). The SDWA has been interpreted to provide only for prospective injunctive relief for ongoing violations. *See Mattoon v. City of Pittsfield*, 980 F.2d 1, 6-7 (1st Cir. 1992) (SDWA only authorizes suit for continuous or intermittent violation, not for past harm); *Batton v. Ga. Gulf*, 261 F. Supp. 2d 575, 598 (M.D. La. 2003) ("The defendants nevertheless are correct that the SDWA does not permit a private right of action for the recovery of compensatory damages . . . ."). The citizen-suit provision also provides that the Court may award costs and attorney's fees when appropriate.

But the Act includes a robust savings clause: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any requirement prescribed by or under this title or to seek any other relief." 42 U.S.C. § 300j-8(d)-(e).

Reading these provisions together, the relevant provisions of the Act can be summarized as follows: the Act is enforced primarily by the states; the Administrator of the EPA may enforce the Act by bringing civil suits and enforcement actions; private citizens may enforce the Act by suing anyone in violation of the Act for injunctive relief, costs, and

attorney's fees; and the Act explicitly does not restrict "any right" under "any statute or common law" to enforce any requirement prescribed by the Act or regulations or for "any other relief."

As in *Smith*, Congress here placed "on local and state [] agencies the primary responsibility for developing a plan to" provide for and enforce the safe drinking water requirements of the SDWA. 468 U.S. at 1011. But as in *Fitzgerald*, the SDWA's protections are "narrower in some respects and broader in others" than the constitutional claims plaintiffs bring here. *See* 555 U.S. at 256. For example, the SDWA provides for citizen suits "against *any person* . . . who is alleged to be in violation of any requirement prescribed by or under" the Act, 42 U.S.C. § 300j-8(a)(1) (emphasis added), whereas the Constitution only reaches government officials and limited classes of private persons acting as the government. *See, e.g.*, *Fitzgerald*, 555 U.S. at 256. And the Act requires conduct that may give rise to a claim under the SDWA, such as for violation of water quality reporting requirements, that would not likely give rise to constitutional claims.

On the other hand, the Court can contemplate conduct related to drinking water that might violate the Constitution, but would not be

proscribed by the Act.  For example, allegations related to the *rates* charged for water, rather than the *quality* of water, could conceivably form the basis of constitutional claims that the SDWA does not reach; such might be the case if government officials charged differing rates for water service based on race.  These significant differences in the contours of the statutory and constitutional rights and protections suggest that Congress did not intend to preempt constitutional claims under § 1983.

And the savings clause is explicit evidence that Congress did not mean to preempt the constitutional claims in this case.  Defendants argue that the savings clause is only meant to apply to "any remedy available under <u>state</u> law," and a parallel savings clause in *Rancho Palos Verdes* did not prevent the Supreme Court from finding that the Telecommunications Act preempted the § 1983 claims in that case.  (*See, e.g.*, Dkt. 102 at 15 n.4 (emphasis in original).)

But that holding of *Rancho Palos Verde* does not apply here.  In that case, the Supreme Court held that the savings clause did not "save" the § 1983 constitutional claim because any § 1983 claim that could have been brought before the operation of the Telecommunications Act was preserved.  *See Rancho Palos Verdes*, 544 U.S. at 126 (the savings clause

"has no effect on § 1983 whatsoever . . . . [T]he claims available under § 1983 prior to the enactment of the TCA continue to be available after its enactment"). In contrast, finding preemption in this case would certainly affect, for example, plaintiffs' § 1983 bodily integrity claim, which would have been available before the SDWA but no longer if preemption applies.

Allowing plaintiffs' constitutional claims to proceed would not "circumvent" the SDWA's "procedures and give access to tangible benefits . . . that were unavailable under" the Act. *Fitzgerald*, 555 U.S. at 254. The procedural requirements for seeking remedies available under the SDWA still apply to claims for violations of the SDWA, because, as Congress intended, the SDWA preempts § 1983 claims for *statutory* violations of the Act. The SDWA's notice requirements must be satisfied before bringing suit *under the Act*: before bringing suit *to enforce the provisions of the SDWA*, plaintiffs must give sixty days' notice of SDWA violations to the Administrator, the alleged violators, and to the state. 42 U.S.C. § 300j-8(b)(1)(A). If the Administrator, the Department of Justice, or the state "is diligently prosecuting a civil action in federal court,"

plaintiffs may not bring a suit *to enforce the Act*, but may "intervene as a matter of right." *Id.* at § 300j-8(b)(1)(B).

But the procedural requirements and remedial restrictions under the Act are not intended to preempt § 1983 claims for violations of the Constitution. The "protections guaranteed by the two sources of law" are "narrower in some respects and broader in others," *Fitzgerald*, 555 U.S. at 256, and Congress explicitly included a robust savings clause that preserves the constitutional claims in this case. Because the SDWA does not preempt plaintiffs' constitutional claims, they must be addressed on the merits. *See, e.g.*, *Rietcheck v. City of Arlington*, No. 04-CV-1239-BR, 2006 U.S. Dist. LEXIS 1490, at *10 (D. Or. Jan. 4, 2006) ("Plaintiffs here . . . bring their First Claim under § 1983 to enforce their constitutional rights to be free from state-created danger, which is an entirely different kind of claim and is only tangentially related to safe drinking water. The Court, therefore, concludes Plaintiffs' First Claim brought under § 1983 is not preempted by the SDWA because Plaintiffs do not seek to vindicate any right addressed by the SDWA.").[4]

---

[4] On February 2, 2017, in *Mays v. Snyder*, now assigned to this Court, Judge John Corbett O'Meara found the opposite. *See Mays v. Snyder*, No. 15-14002, 2017 U.S. Dist. LEXIS 14274, at *11 (E.D. Mich. Feb. 2, 2017). That case is now on appeal.

### iii. Eleventh Amendment Immunity

The governmental defendants, *i.e.*, all defendants except for Veolia and Lockwood, argue that the Eleventh Amendment bars plaintiffs' claims against the State of Michigan, state agencies, and state officials in the official capacities, as well as the City of Flint and city defendants in their official capacities, who would not generally be protected by the Eleventh Amendment, because they were acting as an arm of the state. (*See* Dkts. 52 at 21, 69 at 25, 70 at 24, 96 at 46, 102 at 31, 103 at 27, 105 at 14.) "Eleventh Amendment immunity constitutes a jurisdictional bar, and unless [it] is expressly waived, a state and its agencies may not be sued for damages and injunctive relief in federal court." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984).

Because the city defendants (City of Flint, the emergency managers, and other municipal employees of the city) were not acting as an arm of the state, they are not entitled to Eleventh Amendment Immunity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) ("The bar of the Eleventh Amendment to suit in federal

---

This Court declined to stay this case *sua sponte* until the Court of Appeals issues its opinion and order.

courts extends to States and state officials in appropriate circumstances, . . . but does not extend to counties and similar municipal corporations. The issue here thus turns on whether the [municipality] is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.") (internal citations omitted). To determine whether the city defendants are an arm of the state, the following factors must be considered:

> (1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

*Kreipke v. Wayne State Univ.*, 807 F.3d 768, 775 (6th Cir. 2015) (quoting *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005)). The first factor is "the foremost factor" and given substantial weight. *Id.* at 776.

As to the first factor, the City of Flint, and not Michigan, would be liable for any judgment entered against it while under emergency management. MICH. COMP. LAWS § 141.1560(5) (funds "shall be paid out

44

of the funds of the local government that is or was subject to the receivership administered by that emergency manager"). The city defendants argue that they are arms of the state under MICH. COMP. LAWS § 600.6458(2), because that provision requires the state to pay the liabilities of an "arm of the state" if the arm is unable to pay, but this assumes the conclusion. That the state may be on the hook for judgments against arms of the state does not make the City of Flint an arm of the state. Because this first prong weighs heavily against finding that the City of Flint is an arm of the state, the city defendants must make a showing that this "near-determinative factor" is outweighed by the other three factors. *See Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 761 (6th Cir. 2010).

But the second factor, regarding who between the city and state has the most control over the provision of water services, also weighs against finding that the City of Flint was an arm of the state. The city defendants argue that the state stripped them of home rule by appointing an emergency manager, but under state law, an emergency manager is a municipal agent and thus not subject to the protections of Eleventh Amendment Immunity. *See Kincaid v. City of Flint*, 311 Mich. App. 76,

87-88 (2015).  The city defendants cannot show that they are an arm of the state, and thus are not protected by the Eleventh Amendment.

The state defendants (State of Michigan, state agencies, and state officials in their official capacities) argue that the allegedly injunctive relief plaintiffs seek—repairs to property, a medical monitoring fund, and a monitor to oversee the water operations of Flint for a period of time deemed appropriate by the Court—is in essence retroactive and thus barred by the Eleventh Amendment.  (*See, e.g.*, Dkt. 103 at 30-31.)  The individual defendants acknowledge that suit is brought against them in their official and unofficial capacities, but insofar as they are sued in their official capacities, they seek immunity under the Eleventh Amendment.  (*See, e.g.*, Dkt. 104 at 14.)

To obtain relief against the state, plaintiffs must allege an "ongoing violation of federal law" and seek "relief properly characterized as prospective," because the state has not waived sovereign immunity. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

The closest plaintiffs come to pleading an ongoing violation of federal law in the complaint is alleging that "the damage had been done[,] lead has continued to leach from pipes into the water," and "the water []

continues to poison them." (*See* Dkt. 1 at 44, 58.) Even accepting, as plaintiffs argued at the hearing, that defendants continue to violate the SDWA and the Lead and Copper Rule (Dkt. 147 at 70), the only remedy available to plaintiffs premised on a violation of the SDWA and its regulations is the injunctive relief permitted under the SDWA's citizen-suit provision. The SDWA preempts actions under § 1983 for statutory violations of the Act. (*See infra* at a.ii.)

In *Concerned Pastors for Social Action v. Khouri*, a case brought under the SDWA, the court held that injunctive relief similar to the relief plaintiffs seek here was permissible. 194 F. Supp. 3d 589, 603 (E.D. Mich. 2016). There, the plaintiffs (Concerned Pastors for Social Action, Melissa Mays, the ACLU of Michigan, and the Natural Resources Defense Council, Inc.) properly pleaded ongoing violations of the SDWA and Lead and Copper Rule due to irreversible damage to Flint's lead service lines, which thus continued to leach lead into the drinking water. *Id.* at 602-03. The district court held that it could order the replacement of lead service lines, health-risk mitigation, and monitoring, among other relief, because such relief would be prospective injunctive relief to remedy the ongoing violations of the Act and its regulations. *Id.* at 603. The

parties ultimately entered into a comprehensive settlement agreement providing for most of the equitable relief plaintiffs seek in this case and much more, and the Court retains jurisdiction to enforce it. *See Concerned Pastors for Soc. Action v. Khouri*, No. 16-cv-10277 (E.D. Mich. terminated Mar. 28, 2017) (Dkts. 147, 152, 154).

Even assuming that plaintiffs have sufficiently pleaded an ongoing violation of constitutional law, as opposed to ongoing violations of the SDWA and Lead and Copper Rule, they seek "equitable relief *to remediate the harm caused*" (*id.* at 88 (emphasis added)), which is the very relief they are not permitted to seek against the state under the Eleventh Amendment. *See Verizon Md., Inc.*, 535 U.S. at 645. Only when the fiscal consequences to the state are ancillary to a prospective injunction—for example, enjoining a state from terminating subsistence benefits to indigent individuals without notice and a hearing in violation of the Due Process Clause, which undoubtedly results in more money being paid out of the state fisc, *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970)—would such fiscal consequences not violate the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 667-68 (1974). Here, the fiscal consequences to the state for paying for property damage or a

medical monitoring fund are not ancillary to enjoining an ongoing violation of federal law.

Plaintiffs' request for an injunction for a monitor to oversee the water operations of Flint for a period of time deemed appropriate by the Court is impermissible for a different reason. Plaintiffs do not request prospective injunctive relief for which such monitor could be ordered to provide oversight. All that remains without the equitable relief of repairs to plaintiffs' property and a medical monitoring fund is declaratory relief, damages, costs, and fees. The Court would be ordering a monitor to oversee water operations in Flint without any accompanying injunction against the municipality that such monitor would be overseeing, which is not relief that this Court can order.

Accordingly, plaintiffs' claims as to defendants State of Michigan, MDEQ, MDHHS, and the state, MDEQ, and MDHHS employee defendants in their official capacities only, must be dismissed. The claims may proceed against the city defendants in their official and individual capacities and the state official defendants in their individual capacities.

### iv.  Federal Absolute Immunity

The MDEQ employee defendants and defendant Wurfel argue that they are absolutely immune because federal law authorized and controlled their actions, and the absolute immunity afforded federal officials should be extended to the state officials here.  (*See, e.g.*, Dkt. 102 at 31-32 (citing *Butz v. Economou*, 438 U.S. 478, 490 (1978)); *see* Dkt. 70 at 27-29.)

As the case cited by these defendants makes abundantly clear, federal officials are generally entitled only to *qualified* immunity.  *Butz*, 438 U.S. at 507.  "[I]n a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to [] qualified immunity . . . , subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business."  *Id.*  Only officials exercising judicial or quasi-judicial functions, such as executive action "analogous to those of a prosecutor" exercising prosecutorial discretion, "should be able to claim absolute immunity."  *See id.* at 515; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (absolute immunity is limited to judicial and quasi-judicial functions).

Nothing about the governmental defendants' alleged actions in this case indicate they were performing judicial or quasi-judicial functions. Defendants highlight the federal SDWA, which grants wide latitude to the states as the primary enforcement means of the statute. (*See, e.g.*, Dkt. 102 at 32-33.) The actions that the state actors are alleged to have taken are the very essence of "executive officials exercising discretion," for which they are entitled only to qualified immunity. *See Butz*, 438 U.S. at 507. The motions to dismiss based on absolute immunity are denied.

### v. Whether the Court of Appeals has exclusive jurisdiction over this case

Defendants City of Flint, Earley, Ambrose, Croft, and Glasgow argue that this case is effectively an appeal of the Emergency Administrative Order that the EPA issued on January 21, 2016, pursuant to its emergency powers under the SDWA, and such order is a final order that can only be appealed to the Court of Appeals under the Act. (*See* Dkts. 52 at 20-21.) According to these defendants, plaintiffs' relief requires finding numerous facts that might conflict with the Administrative Order, and thus amounts to an appeal of it. (*Id.* at 20-21.) Plaintiffs respond that this Court should reject the argument as the

court did in *Concerned Pastors for Social Action v. Khouri*. (*See, e.g.*, Dkt. 122 at 25-26.)

In that case, defendants similarly argued that the plaintiffs' claims were "an implicit request for judicial review of the [January 21] EPA order." *Concerned Pastors for Soc. Action v. Khouri*, 194 F. Supp. 3d 589, 596 (E.D. Mich. 2016). The court rejected the argument because the relief plaintiffs sought, although parallel to "the EPA's directives to the Flint and Michigan respondents," and which might "augment those orders," was "wholly collateral to the SDWA's review provisions." *Id.* at 599.

The SDWA's exclusive review provision is even less applicable to this case than *Concerned Pastors*. The *Concerned Pastors* plaintiffs brought their case directly under the SDWA, seeking relief using its citizen suit provision, see *id.* at 596, whereas plaintiffs in this case do not bring any claim under the SDWA. And like the plaintiffs there, the plaintiffs in our case are "not a party to the action between the EPA and the City of Flint," nor are they "identified as 'Respondents' in the EPA's emergency order." *Id.* at 598. They are "not seeking to enjoin the EPA Order either explicitly or implicitly." *Id.* Federal statutory provisions providing for exclusive jurisdiction in the Courts of Appeals are meant to

"bar litigants from 'requesting the District Court to enjoin action that is the outcome of the agency's order.'"  *Id.* at 598-99 (quoting *F.C.C. v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984)).  Because the relief plaintiffs seek would not do so, defendants' motion to dismiss on this basis is denied.

### b. Whether plaintiffs engage in improper group pleading under Rule 8 of the Federal Rules of Civil Procedure

Some defendants argue that plaintiffs engaged in improper group pleading and thus failed to give defendants "fair notice of what the . . . claim[s are] and the grounds upon which [they] rest." (*See, e.g.*, Dkt. 52 at 25-26 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see* Dkts. 102 at 29-31, 105 at 18.)  The complaint clearly describes the specific conduct plaintiffs allege as to each individual defendant. Defendants have more than fair notice of the claims against them, so the motions to dismiss on this basis are denied.

### c. Federal claims

As set forth above, plaintiffs' claims cannot proceed against the State of Michigan, MDEQ, MDHHS, or individual state officials in their official capacities because they have immunity under the Eleventh Amendment.  The remaining governmental defendants and individual

state officials in their individual capacities argue they are entitled to qualified immunity and also that plaintiffs fail to plead any constitutional claim. The Court undertakes a two-step analysis to determine whether a defendant is entitled to qualified immunity. First, "viewing the facts in the light most favorable to plaintiff[s], [the Court] determine[s] whether the allegations give rise to a constitutional violation." *See Shreve v. Franklin Cty.*, 743 F.3d 126, 134 (6th Cir. 2014). Second, the Court "assess[es] whether the right was clearly established at the time of the incident." *See id.* The Court may undertake either step first, with certain limitations not applicable here, *Camreta v. Greene*, 563 U.S. 692, 694 (2011); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and addresses each federal claim in that order.

### i. Count 1

In Count 1, plaintiffs bring a § 1983 claim against defendants City of Flint, Croft, Glasgow, Snyder, Earley, Ambrose, Shekter Smith, Wyant, Busch, Cook, Prysby, and Wurfel, alleging that these defendants deprived plaintiffs of a property right to which they are entitled pursuant

to a state-created contract, in violation of substantive due process.[5] According to plaintiffs, these defendants violated their property right to clean water "when, ceasing to provide [p]laintiffs with safe, potable water, they provided [p]laintiffs with poisonous, contaminated water." (Dkt. 1 at 64-65.) Although this is a tremendously serious allegation, plaintiffs fail to plead the existence of a constitutionally protected fundamental interest, and a substantive due process claim cannot be based on a state-created contract right alone. The motions to dismiss this claim are granted.

"[A]n entitlement under state law to water and sewer service d[oes] not constitute a protectable property interest for purposes of substantive due process." *Mansfield Apartment Owners Ass'n v. City of Mansfield,* 988 F.2d 1469, 1476 (6th Cir. 1993) (quoting *Ransom v. Marrazzo,* 848 F.2d 398 (3d Cir. 1988)); *see Bowers v. City of Flint,* 325 F.3d 758, 763 (6th Cir. 2003) ("[M]ost, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by

---

[5] Plaintiffs also bring this claim against the State of Michigan, MDEQ, and the individual state defendants in their official capacities. As set forth above, plaintiffs' claims against these defendants are barred by Sovereign Immunity. Hereinafter, defendants entitled to Sovereign Immunity are excluded from any analysis of the merits of a claim in which they are included by plaintiffs.

substantive due process.") (quotations omitted). Rather, "[s]ubstantive due process protects fundamental interests, not state-created contract rights." *Thomson v. Scheid,* 977 F.2d 1017, 1020 (6th Cir. 1992) (citing *Charles v. Baesler,* 910 F.2d 1349 (6th Cir.1990)).

Plaintiffs fail to identify any authority to show they have a constitutionally protected fundamental interest in clean water. And the Sixth Circuit has explicitly said that they do not. Because plaintiffs base this substantive due process claim solely on an alleged property right to clean water created by a contract with the state, this claim is dismissed.

### ii. Count 2

In Count 2, plaintiffs bring a § 1983 claim against defendants City of Flint, Croft, Glasgow, Snyder, Earley, Ambrose, Shekter Smith, Wyant, Busch, Cook, Prysby, and Wurfel, alleging that these defendants deprived plaintiffs of a property right to which they are entitled pursuant to a state-created contract, in violation of procedural due process. According to plaintiffs, defendants deprived them of their contractually based property right to purchase and receive safe, potable drinking water without notice or a hearing. (Dkt. 1 at 65-66.) Defendants argue that plaintiffs fail to plead the existence of a state-created property interest

or that the procedural protections afforded by the state are constitutionally infirm. (*See, e.g.*, Dkt. 52 at 29.) Because plaintiffs fail to plead both, the motions to dismiss this claim are granted.

To establish a procedural due process violation under § 1983, plaintiffs must show: (1) that they had a protected life, liberty, or property interest; (2) that they were deprived of that protected interest; and (3) that the state did not afford them adequate procedural rights before depriving them of their protected interest. *Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir. 2010).

As noted above, "state-created contract rights" are "assuredly protected by procedural due process." *Bowers,* 325 F.3d at 763. And other courts have found that "continued utility service is a property right within the meaning of the due process clause" requiring pre-deprivation notice and a hearing. *Bradford v. Edelstein*, 467 F. Supp. 1361, 1369 (S.D. Tex. 1979); *see, e.g.*, *Keating v. Neb. Pub. Power Dist.*, 562 F.3d 923, 925 (8th Cir. 2009) (reversing district court dismissal of § 1983 claim when plaintiffs alleged that "state officials deprived them of their procedural due process rights when those officials ordered them to cease drawing water from the Niobrara Watershed without providing prior

notice or a hearing"); *see generally Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978) ("Ordinarily, due process of law requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest.").

But property interests "are created and their dimensions are defined by existing rules or understandings that stem from . . . state law." *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). So, "property interests are created by state law"; "whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law." *Bowers*, 325 F.3d at 765 (quotations omitted). "[O]nly those interests to which one has a legitimate claim of entitlement, including but not limited to statutory entitlements, are protected by the due process clause." *Id.*

Plaintiffs fail to plead that they have a contract with the state or City of Flint under Michigan law, and thus fail to establish the first element required to make out their procedural due process claim. *See Wedgewood Ltd. P'ship I*, 610 F.3d at 349. Under Michigan law, "a contract requires mutual assent." *Kloian v. Domino's Pizza, L.L.C.*, 273 Mich. App. 449, 453 (2006). But there is no mutual assent when a

"transaction between the parties with respect to the 'exchange' of money for services was wholly devoid of free and open bargaining, the hallmark of contractual relationships." *Borg-Warner Acceptance Corp. v. Dep't of State*, 433 Mich. 16, 22 (1989). Specifically, if defendant City of Flint is "not legally capable of declining to" provide water services or "otherwise altering the basic nature of its duty," and plaintiffs cannot choose "not to pay the required fee," there is no mutual assent to form a contract. *See id.*; *see, e.g.*, *Lufthansa Cargo A.G. v. Cty. of Wayne*, 142 F. App'x 265, 266 (6th Cir. 2005) (defendant legally required to provide service, and charge of fee for service "does not create an implied contract under Michigan law absent consideration in return").

Plaintiffs claim that they "entered into a contract for the purchase and sale of potable, safe drinking water" with the "City of Flint." (Dkt. 1 at 70.) But the City of Flint, through its City Counsel (and possibly the emergency managers in this case), sets the rate for water, see Flint Code of Ord. § 46-52(b)(1), (c)(1), which residents must pay to receive water service. *See* Flint Code of Ord. §§ 46-50, 46-51. And water service "may be denied to any consumer *who is in default* to the Division of Water Supply," a division of the Department of Public Works, which suggests

that such service may not be denied if a consumer is not in default. *Id.* at §§ 46-16 (emphasis added). Although Flint Code of Ord. § 46-16 defines plaintiffs as consumers, water as a commodity, and the relationship between plaintiffs and Flint as "that of vendor and purchaser," there is no "mutuality" as required by Michigan contract law. *See Borg-Warner Acceptance Corp.*, 433 Mich. at 22.

And even if plaintiffs had adequately pleaded the existence of a state-created contract right, they fail to plead that the procedures afforded them by the state are constitutionally inadequate. To overcome defendants' motions to dismiss, plaintiffs must plead with particularity that the process afforded them under state law was inadequate, including post-deprivation damages remedies to redress the alleged breach of contract. *See Vicory v. Walton*, 721 F.2d 1062, 1063 (6th Cir. 1983) ("[I]n section 1983 damage suits for deprivation of property without procedural due process the plaintiff has the burden of pleading and proving the inadequacy of state processes, including state damage remedies to redress the claimed wrong."). Plaintiffs do not sufficiently plead that state procedures were inadequate, so their procedural due process claim is dismissed.

### iii. Count 3

In Count 3, plaintiffs bring a § 1983 state-created danger claim, alleging that all defendants except Veolia and Lockwood violated their substantive due process rights. According to plaintiffs, defendants each acted to expose them to toxic, lead-contaminated water by making, causing to be made, and causing or making representations that the water was safe to drink, and these actions and omissions were objectively unreasonable in light of the facts and circumstances confronting them. (Dkt. 1 at 66-68.)

Defendants argue that plaintiffs fail to plead this claim because they do not allege an act of violence inflicted by a third party or danger specific to plaintiffs as opposed to the public at large. (*See, e.g.*, Dkt. 52 at 31.) Plaintiffs respond that it "is illogical to claim that public officials cannot be held liable for creating a danger and injuring a plaintiff, whereas they may be held liable if they created or increased a risk of harm that was carried out by a private third party." (*See* Dkt. 122 at 37.) Because plaintiffs fail to plead that defendants subjected them to a special danger as distinguished from the public at large, the motions to dismiss this claim are granted.

To prevail on a state-created danger claim, plaintiffs must establish three elements: (1) an affirmative act on the part of the government that creates or increases the risk to plaintiffs, (2) a special danger to plaintiffs as distinguished from the public at large, and (3) the requisite degree of state culpability. *Stiles v. Grainger Cty.*, 819 F.3d 834, 854 (6th Cir. 2016). Even assuming plaintiffs can establish a state-created danger claim for harm directly caused by state actors, as opposed to private third-parties, plaintiffs fail to show that defendants in this case created a special danger to plaintiffs as distinguished from the public at large.

In the Sixth Circuit, the second prong of a state-created danger claim is satisfied when "the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims." *Jones v. Reynolds*, 438 F.3d 685, 696 (6th Cir. 2006). But when "the victim was not identifiable at the time of the alleged state action/inaction," the Sixth Circuit holds "that a § 1983 suit may not be brought under the 'state created danger' theory." *Id.* at 697.

For example, a plaintiff cannot satisfy this standard when "officers never interacted with [decedent]," no "evidence ha[d] been put forward suggesting that the officers had any reason to know that they were

putting [the plaintiff] at risk by their action/inaction," and the crowd plaintiff was among when she was injured "contained at least 150 people." *Id.*; *see also Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005) (failing to enforce or lower the speed limit on a residential street "did not create a 'special danger' to a discrete class of individuals (of which the [plaintiffs'] son was a member), as opposed to a general traffic risk to pedestrians and other automobiles"); *Jones v. City of Carlisle*, 3 F.3d 945, 949-50 (6th Cir. 1993) (holding that an epileptic driver was "no more a danger to [the plaintiff] than to any other citizen on the City streets"); *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986) (holding that the release of an inmate on parole, who eventually murdered a citizen, did not violate the Due Process Clause because "there is [no] showing that the victim, as distinguished from the public at large, faces a special danger"). Plaintiffs fail to plead the second element of their state-created danger claim, so it is dismissed.[6]

---

[6] It seems there is little difference between the state-created danger standard of constitutional liability and the shocks-the-conscience standard of constitutional liability. *See, e.g.*, *Henry v. City of Erie*, 728 F.3d 275, 282 (3d Cir. 2013) (to establish claim under state-created danger theory, plaintiff must show that "a state actor acted with a degree of culpability that shocks the conscience," among other elements similar to those in the Sixth Circuit); *Jones v. Reynolds*, 438 F.3d 685, 695 (6th Cir. 2006) (state-created danger case citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998), which address shocks-the-conscience standard). Here, plaintiffs could not

### iv.  **Count 4**

In Count 4, plaintiffs bring a § 1983 substantive due process claim, alleging that all defendants except Veolia and Lockwood unlawfully violated their fundamental interest in bodily integrity.  Defendants argue that only a forcible physical intrusion into a person's body against the person's will without a compelling state interest will suffice, and also that plaintiffs fail to plead that defendants were motivated by malice or

---

identify, and the Court could not independently find, any case law in the Sixth Circuit in which a state-created danger claim was permitted to proceed against the government for harm that was caused directly, as opposed to harm that was caused by a third party. *But see Jones*, 438 F.3d at 695 (noting in *dicta* that "[h]ad the officers organized or participated in this race, the issue would cease to turn on whether they were responsible for harm caused by a private actor and would turn instead on whether they had caused the harm themselves").  Given that the state-created danger theory arises from the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), one way courts of appeals interpret the doctrine is that liability attaches to the state only "when it fails to protect [a plaintiff] from third-party harms that it helped create."  *See Barber v. Overton*, 496 F.3d 449, 458 n.1 (6th Cir. 2007) (Cook, J., concurring) (quoting *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) ("We join the other circuits in holding that, under the State endangerment concept, an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm.")).  Because plaintiffs otherwise fail to plead the elements of a state-created danger claim under the Sixth Circuit's formulation, the Court need not decide whether plaintiffs can maintain a state-created danger action against government actors for harm they caused directly; the Court merely highlights that state-created-danger claims likely collapse into shocks-the-conscience claims, like that which plaintiffs pursue in Count 4 of their complaint.  *See Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) ("*Lewis* clarified that the shocks-the-conscience test, first articulated in *Rochin v. California* [], governs *all* substantive due process claims based on executive, as opposed to legislative, action.") (emphasis in original).

sadism.  (*See, e.g.*, Dkt. 52 at 32-33; *see* Dkts. 69 at 30-33 and 39-41, 70 at 27-32 and 38-39, 96 at 32-35, 102 at 39-44 and 57-62, 103 at 33-36 and 47-52, 105 at 15-16.)  Because plaintiffs sufficiently plead that the conduct of many of the individual governmental defendants was so egregious as to shock the conscience and violate plaintiffs' clearly established fundamental right to bodily integrity, the claim is only dismissed as to defendants Snyder, Glasgow, and Cook.

"The touchstone of due process is protection of the individual against arbitrary action of the government," and the Supreme Court has defined such a violation as "executive abuse of power as that which shocks the conscience" in the "constitutional sense."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998).  To plead this claim against each executive official in this case, "plaintiffs must show[] not only that the official's actions shock the conscience, but also that the official violated a right otherwise protected by the substantive Due Process Clause."  *See Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) (citing cases).

It has long been held that one's right to bodily integrity is a fundamental interest under the Constitution.  *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is

more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."); *see Albright v. Oliver*, 510 U.S. 266, 272 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."). As to the first prong of the qualified immunity analysis, plaintiffs' "allegations give rise to a constitutional violation." *Shreve*, 743 F.3d at 134. They have a fundamental interest in bodily integrity under the Constitution, and, as set forth below, defendants violated plaintiffs' fundamental interest by taking conscience-shocking, arbitrary executive action, without plaintiffs' consent, that directly interfered with their fundamental right to bodily integrity. *Lewis*, 523 U.S. at 845-46; *Cui*, 608 F.3d at 64; *see generally Siegert v. Gilley*, 500 U.S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."). As to the second prong of the qualified immunity analysis, a series

66

of Supreme Court cases over the last seventy-five years makes clear that defendants violated plaintiffs' clearly established rights.

The Court may consider decisions by the United States Supreme Court, the Sixth Circuit, and district courts within the Sixth Circuit to determine whether the law has been clearly established. *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). Decisions from other circuits may be considered "if they 'point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.'" *Barrett v. Stubenville City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004) (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir. 1988)) (alterations in original).

In 1990, the Court held that the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990); *see also Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."). Whether such

67

intrusion is consensual has been a key consideration in determining the constitutionality of such invasion of an individual's person since at least 1942, when the Supreme Court held that the forced sterilization of adults is unconstitutional. *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942); *see also Winston v. Lee*, 470 U.S. 753, 766-67 (1985) (the potentially harmful, nonconsensual surgical intrusion into a suspect's chest to recover a bullet without a compelling need is unconstitutional).

That defendants here violated plaintiffs' clearly established right to be free from conscience-shocking, arbitrary executive action that invades their bodily integrity without their consent is further exemplified by courts of appeals' decisions interpreting these Supreme Court cases. *See, e.g.*, *Barrett v. United States*, 798 F.2d 565, 575 (2d Cir. 1986) (no qualified immunity, because actions of defendants violated New York law by administering a "dangerous drug to human subjects without adequate warning or notice of the risk involved," and thus defendants "could be held responsible in damages for the consequences"); *Lojuk v. Quandt*, 706 F.2d 1456, 1465-66 (7th Cir. 1983) (noting that "compulsory treatment with anti-psychotic drugs may invade a patient's interest in bodily integrity, personal security and personal dignity. . . . , [and] compulsory

treatment may invade a patient's interest in making certain kinds of personal decisions with potentially significant consequences," in holding that these fundamental interests are implicated by compulsory electro shock therapy—"It should be obvious in light of this liberty interest that the state cannot simply seize a person and administer [electro shock therapy] to him without his consent"); *Rogers v. Okin*, 634 F.2d 650, 653 (1st Cir. 1980) ("[A] person has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs."), *vacated and remanded Mills v. Rogers*, 457 U.S. 291, 303 (1982) (only applies to *involuntarily* admitted patients).[7]

---

[7] *See also Wright v. City of Phila.*, No. 10-1102, 2015 U.S. Dist. LEXIS 25278, at *37-38 (E.D. Pa. Mar. 2, 2015) (it is clearly established that the substantive due process right to bodily integrity is violated when the state allows individuals to suffer from prolonged asbestos exposure in part because "[t]he health effects associated with asbestos exposure have been within the public's knowledge for years"); *Athans v. Starbucks Coffee Co.*, No. CV-06-1841-PHX-DGC, 2007 U.S. Dist. LEXIS 21412, at *9 (D. Ariz. Mar. 23, 2007) (citing Supreme Court, Ninth Circuit, and Fourth Circuit cases to find that a pro se plaintiff states a claim by alleging "intentional poisoning" by a government official); *Bounds v. Hanneman*, No. 13-266 (JRT/FLN), 2014 U.S. Dist. LEXIS 43947, at *27-29 (D. Minn. Mar. 31, 2014) (denying qualified immunity because "a reasonable officer should have known that providing an illicit drug to a citizen, where such provision was not required by the officer's legitimate duties, violates clearly established law"); *In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 818 (S.D. Ohio 1995) ("[B]etween 1960 and 1972 the right to due process as enunciated in *Rochin* [*v. California*, 342 U.S. 165 (1952)] was sufficiently clear to lead

It would be readily apparent to any reasonable executive official, given this landscape, that a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into such individuals without their consent, especially when such substances have zero therapeutic benefit. *Cf. Harper*, 494 U.S. at 229 (noting that although "therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects"). This is not a case in which there are only a "few admittedly novel opinions from other circuit or district courts," which would be insufficient "to form the basis for a clearly established constitutional right." *Barrett*, 388 F.3d at 972. The breadth and depth of the case law "point[s] unmistakably to the unconstitutionality of the conduct complained of" here, which was "so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on

———————————

a reasonable government official to the conclusion that forcing unwitting subjects to receive massive doses of radiation was a violation of due process."); *Thegpen v. Dillon*, No. 88 C 20187, 1990 U.S. Dist. LEXIS 3132, at *9-11 (N.D. Ill. Feb. 1, 1990) (clearly established that "compulsory treatment with anti-psychotic drugs may invade a patient's interest in bodily integrity"); *Osgood v. District of Columbia*, 567 F. Supp. 1026, 1033 (D.D.C. 1983) ("[t]here is no serious dispute" that administering psychotropic drugs against an inmate's will violated the Due Process Clause of the Fifth Amendment).

constitutional grounds, would be found wanting." *Id.* (quoting *Seiter,* 858 F.2d at 1177).

Taking plaintiffs' allegations as true and in the light most favorable to them, as the Court must, the violation of plaintiffs' clearly established rights is adequately pleaded against defendants City of Flint, Earley, Ambrose, Wyant, Shekter Smith, Busch, Prysby, Wurfel, Wells, Lyon, Peeler, Scott, and Croft.

Plaintiffs plead (with particularity as to which defendant did what) that these defendants were the decision makers responsible for knowingly causing plaintiffs to ingest water tainted with dangerous levels of lead, which has no therapeutic benefits, and hiding the danger from them. The emergency managers and individual state employees switched the source of Flint's water from the Detroit River to the Flint River, then knowingly took deliberate action that violated federal and state, civil and possibly even criminal law, which caused the lead levels in Flint's water to rise to dangerous levels.[8] They knew that their actions

---

[8] Defendants Earley, Ambrose, Shekter Smith, Busch, Prysby, Peeler, Scott, and Croft, among others, all face felony and misdemeanor criminal charges stemming from the Michigan Attorney General's Flint Water Investigation. *See generally Flint Water Investigation*, STATE OF MICHIGAN ATTORNEY GENERAL BILL SCHUETTE, http://www.michigan.gov/ag/0,4534,7-164-78314---,00.html (last visited May 31, 2017). *Cf. Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999) ("[I]t is well-settled

were exposing the residents of Flint, including plaintiffs, to dangerous levels of lead. Lead poisoning caused plaintiffs to suffer from severe medical problems with their hair, skin, digestive system, and organs, as well as brain and other developmental injuries including cognitive deficits, among other issues. (Dkt. 1 at 65.)

And when the evidence confirmed that, in fact, the lead levels in the water and in residents' blood were rising, these defendants worked to discredit the evidence and knowingly and proactively made false statements to the public to persuade residents that the water was safe to consume. They did so, even though their own testing revealed the opposite. Many residents, plaintiffs included, continued to consume the water in reliance on defendants' false assurances.

It cannot be that such actions are not "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience." *See Lewis*, 523 U.S. at 847 n.8. Nor can it be said that reasonable officials would not have had fair notice that such actions would violate the Constitution, *i.e.*, that defendants were violating plaintiffs' clearly

---

that 'federal courts may take judicial notice of proceedings in other courts of record' . . . .") (quoting *Granader v. Public Bank*, 417 F.2d 75, 82-83 (6th Cir. 1969)).

established right to bodily integrity and to be free from arbitrary, conscience shocking executive action. As recently reiterated by the Sixth Circuit, immunity does not extend to "the plainly incompetent or those who knowingly violate the law." *Arrington-Bey v. City of Bedford Heights*, No. 16-3317, 2017 U.S. App. LEXIS 3429, at *8 (6th Cir. Feb. 24, 2017) (quoting *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 551 (2017)). And particularly with respect to the individual governmental defendants who are facing felony and misdemeanor criminal charges pursuant to the Michigan Attorney General's Flint Water Investigation, qualified immunity cannot and should not protect them from civil liability for the constitutional violations that are pleaded against them. *Id.*; *see Barrett*, 798 F.2d at 575 (no qualified immunity for defendants who knowingly violated state criminal law).

Again, plaintiffs' involuntariness here is key. *See Riggins v. Nevada*, 504 U.S. 127, 137-38 (1992) (forced administration of antipsychotic medication during trial violated Fourteenth Amendment); *Harper*, 494 U.S. at 229 ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."); *Cruzan*, 497 U.S. at 278 ("[A] competent person

has a constitutionally protected liberty interest in refusing unwanted medical treatment."); *Rochin v. California*, 342 U.S. 165, 172 (1952) ("Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents . . . . This is conduct that shocks the conscience."). Plaintiffs' exposure to dangerous levels of lead was involuntary on two levels.

First, it was involuntary because these defendants hid from plaintiffs that Flint's water contained dangerous levels of lead. Misleading Flint's residents as to the water's safety—so that they would continue to drink the water and Flint could continue to draw water from the Flint River—is no different than the "forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional." *See Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 313-14 (D. Mass. 1999) (utilizing false pretenses to engage patients in participating in radiation treatments with no therapeutic value no different than "forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional"). Second, it was involuntary because under state and municipal law, plaintiffs were not permitted to receive

water in any other way.  *See* Flint Code of Ord. §§ 46-25, 46-26, 46-50(b). The city defendants themselves make this argument.  (*See* Dkt. 52 at 37.) Even had plaintiffs wanted to receive water from a different source, they would not have been permitted to.

Defendants claim they had a legitimate state interest in lowering the cost of Flint's water services.  Accepting that as true, any such cost-cutting measure cannot justify the harm that was knowingly inflicted on plaintiffs without their consent.  This is especially so given that Michigan law "forbids the price [of any water sold] to exceed[] 'the actual cost of service as determined under the utility basis of rate-making.'"  *Davis v. City of Detroit*, 269 Mich. App. 376, 379 (2006) (quoting MICH. COMP. LAWS § 123.141).

The alleged actions of defendants City of Flint, Earley, Ambrose, Wyant, Shekter Smith, Busch, Cook, Prysby, Wurfel, Wells, Lyon, Peeler, Scott, and Croft are so egregious that "[e]ven absent the abundant case law that has developed on this point since the passage of the Bill of Rights, the Court would not hesitate to declare that a reasonable government official must have known that by instigating and participating in" the knowing provision of lead-laden water and then

intentional and active concealment of this truth to the residents of Flint, who were not legally permitted to obtain alternative water service, "he would have been acting in violation of those rights." *See In re Cincinnati Radiation Litig.*, 874 F. Supp. at 815. For these reasons, the motions to dismiss are denied as to these defendants.

Plaintiffs fail to plead with particularity that defendant Snyder was directly responsible for being involved in the decision making himself— rather, according to plaintiffs, he should be responsible because he appointed the emergency managers who are also defendants in this case. And they plead that defendant Glasgow argued that if "water is distributed from this plant in the next couple of weeks, it w[ould] be against [his] direction," but that "management above" overrode him. Finally, plaintiffs plead that defendant Cook was involved in the decision to switch to Flint River water without proper study or corrosion control, but fail to plead that he was involved in misleading the public after it became apparent that lead was rising to dangerous levels in the drinking water. Plaintiffs fail to allege that these three defendants violated clearly established law, so Count 4 must be dismissed as to them.

### d. State claims

The governmental defendants argue that they have state statutory immunity for violations of state tort law and that plaintiffs otherwise fail to plead the state-law claims. Defendants Veolia and Lockwood argue that plaintiffs fail to plead their claims and that certain relief plaintiffs seek is unavailable in Michigan. The arguments are addressed in that order.

### i. Whether the governmental defendants have state statutory immunity for violations of state tort law

Under MICH. COMP. LAWS § 691.1407, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function," *id.* at § 691.1407(1), and "the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her . . . executive authority." *Id.* at § 691.1407(5).

As to lower level government employees, "each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer[ or] employee . . . while in the course of employment or service . . . while acting on behalf of

a governmental agency if all of the following are met: (a) [the officer or employee] is acting or reasonably believes he or she is acting within the scope of his or her authority"; "(b) [t]he governmental agency is engaged in the exercise or discharge of a governmental function"; and (c) the officer's or employee's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." *Id.* at § 691.1407(2).

For such lower level employees, Michigan case law requires not only that the employee be grossly negligent, but also that the employee's actions were *the* proximate cause of the injury for a tort claim to proceed. An employee's action is the proximate cause of the injury if it is "the one most immediate, efficient, and direct cause, of the [plaintiffs]' injuries." *Robinson v. City of Detroit*, 462 Mich. 439, 446 (2000). "There cannot be other more direct causes of plaintiff's injuries." *White v. Roseville Pub. Schs.*, No. 307719, 2013 Mich. App. LEXIS 342, at *10 (Mich. Ct. App. Feb. 21, 2013). If no reasonable juror could find that a lower level official was "*the one* most immediate" cause of plaintiffs' injuries, the claims as to those officials must be dismissed. *Robinson*, 462 Mich. at 463.

The exception to the immunity statute is when plaintiffs seek "to recover for bodily injury or property damage arising out of the

performance of a proprietary function." MICH. COMP. LAWS § 691.1413. A proprietary function is "any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees." *Id.*

Plaintiffs argue that the governmental defendants are not entitled to governmental immunity because their primary purpose in selling water to plaintiffs was to produce a pecuniary profit for the state and its agencies, and the municipalities' and state's sale of water is not normally supported by taxes and fees. (Dkt. 1 at 85.)

Michigan courts have held that the "operation of the water department is not a proprietary activity," *i.e.*, is not excepted from governmental immunity, in part because Michigan law "requires the price of any water sold to be based on, and forbids the price to exceed, 'the actual cost of service as determined under the utility basis of rate-making.'" *Davis v. City of Detroit*, 269 Mich. App. 376, 379 (2006) (quoting MICH. COMP. LAWS § 123.141). Thus, the proprietary function exception to state governmental immunity does not apply.

Aside from making the proprietary function/non-governmental function argument, plaintiffs seem to concede that the emergency managers are the highest appointed executive officials of the city. The tort claims against the emergency managers are thus dismissed. So too for defendant Croft, Flint's Director of the Department of Public Works.

Similarly, the MDEQ employee defendants argue that defendant Shekter Smith is entitled to absolute immunity as the highest appointed executive official of her agency—she is the Chief of the Office of Drinking Water and Municipal Assistance for MDEQ. MICH. COMP. LAWS § 691.1407(5). Defendant Wyant, as the former Director of MDEQ, also claims absolute immunity from the tort claims (Dkt. 69 at 22), as does defendant Wurfel, as the Director of Communications of MDEQ. (Dkt. 70 at 40.) Plaintiffs do not argue that any of these defendants are not the highest appointed or elected officials of their levels of government. Rather, plaintiffs argue that none of the MDEQ employee defendants are absolutely immune because they "knowingly l[ied] to EPA and the public as 'performing oversight,' and the lies alleged [] did not serve the ends of regulatory oversight"; because they used their office for an illegitimate

80

purpose, according to plaintiffs, they are not entitled to immunity. (Dkt. 123 at 46-50.)

But whether something is considered a governmental function is defined by the *general* activity performed, not the specific conduct of the individual employees. *Smith v. State,* 428 Mich. 540, 608 (1987). Michigan courts would find that these MDEQ employee defendants were performing a governmental function, so they are entitled to immunity under the state immunity statute. The tort claims against defendants Shekter Smith, Wyant, and Wurfel are thus dismissed.

Finally, the State Defendants argue that defendants Snyder, Lyon, and Wells are entitled to absolute immunity under the state immunity statute. (*See* Dkt. 103 at 21.) Because under Michigan law they are the highest "elective or highest appointive executive official" of their departments (see Dkt. 144 (defendant Wells entitled to absolute immunity)), and they were acting in the scope of their executive authority, the tort claims against them are dismissed.

As to defendant Glasgow, a lower level employee, no reasonable jury could find that he is the one defendant most directly responsible for plaintiffs' harm. Plaintiffs allege that defendant Glasgow stated "[i]f

water is distributed from this plant in the next couple of weeks, it w[ould] be against [his] direction," because he "need[ed] time to adequately train additional staff and to update [MDEQ's] monitoring plans before [he would] feel [MDEQ was] ready." (Dkt. 1 at 22.) They allege that defendant Glasgow stated "management above" seemed "to have their own agenda." (*Id.*) At the very least, the "management above" would be more directly responsible for plaintiffs' harms. Thus, the tort claims are also dismissed as to defendant Glasgow.

And defendants Prysby (an engineer at MDEQ), Cook (a water treatment specialist at MDEQ), and Busch (the district supervisor for MDEQ), are lower level employees nonetheless entitled to immunity. As with defendant Glasgow, even if plaintiffs sufficiently pleaded that defendants Prysby, Cook, and Busch were grossly negligent, reasonable jurors could not find that any one of them was *the* proximate cause of plaintiffs' injuries. As alleged, defendants "Cook, Busch, and Prysby were undeniably aware that no corrosion control was being used in Flint" by "no later than April 2015." (Dkt. 1 at 34.) This was long after the water allegedly began to harm plaintiffs. Plaintiffs say it was "likely much earlier," but this is insufficient to show that defendants Cook,

Busch, and Prysby were the proximate cause of their injuries. Thus, the state tort claims against them are dismissed.

Finally, even accepting as true that plaintiffs sufficiently allege Nancy Peeler, a lower level employee at MDHHS, acted with gross negligence, plaintiffs fail to show that she was the proximate cause of their injuries. Taking plaintiffs' allegations as true, defendant Peeler, at all relevant times an MDHHS employee in charge of its childhood lead poisoning prevention program, participated in, directed, and oversaw the Department's efforts to hide information to save face, and to obstruct the efforts of outside researchers. (Dkt. 1 at 12-13.) And she tried to generate evidence that there was no lead contamination problem, even when her own Department had data that verified outside evidence to the contrary. (*Id.* at 13.) Moreover, when MDHHS epidemiologist Cristin Larder emailed defendant Peeler, among others, noting an increase in blood lead levels in Flint just after the switch and concluding that the issue "warrant[ed] further investigation," Peeler attributed it to seasonal variation. (*Id.* at 48.) But given that lead levels were already rising in plaintiffs' blood by the time Peeler is alleged to have acted, Michigan courts would likely hold that a reasonable juror could not find that she

83

was *the* proximate cause of the harm.  Thus, the claims against her must be dismissed.[9]

Plaintiffs argue that dismissal is premature, and "it should be sufficient that [d]efendant's alleged actions, taken as true . . . , could be 'the' proximate cause of the Flint crisis."  (Dkt. 121 at 30.)  But it is not enough to say any defendant's actions were "among" those that caused plaintiffs' harm.  (*Id.*)  Rather, the test is whether a jury could reasonably find, if plaintiffs proved their allegations, that a defendant, individually, was the most direct cause of the harm.

As this case highlights, the more governmental actors that are involved in causing a massive tort in Michigan, the less likely it is that state tort claims can proceed against the individual government actors, given the way the state immunity statute operates.  Because the harm that befell plaintiffs was such a massive undertaking, and took so many government actors to cause, the perverse result is that none can be held responsible under state tort law, at least based on plaintiffs' pleadings; it is nearly impossible to point to any one of the defendants as *the* most

---

[9] Plaintiffs do not directly address defendant Scott, but they similarly fail to plead how he—a data manager at MDHHS who attempted to refute outside evidence of rising lead levels—is *the* proximate cause of plaintiffs' injuries.  The state tort claims as to defendant Scott are thus dismissed.

proximate cause of plaintiffs' injuries. *White*, 2013 Mich. App. LEXIS 342, at \*10 ("There cannot be other more direct causes of plaintiff's injuries.").

It is plaintiffs' burden to plausibly plead who was most directly responsible for the harm. They fail to do so here, so all of the lower-level governmental employees are immune from plaintiffs' state tort claims. Accordingly, plaintiffs' Counts 7 (nuisance), 8 (trespass), 12 (gross negligence), 13 (intentional infliction of emotional distress), and 14 (negligent infliction of emotional distress) are dismissed as to all remaining governmental defendants, based on state statutory immunity.

### ii. Breach of contract

In Count 5, plaintiffs allege that defendants City of Flint and State of Michigan breached the contract defendants had with plaintiffs for the sale and purchase of safe, potable water. As set forth above, plaintiffs fail to sufficiently plead that they had such a contract under Michigan law. *See supra* III.c.ii. Plaintiffs claim for breach of contract is thus dismissed.

### iii. Breach of implied warranty

In Count 6, plaintiffs allege that defendants City of Flint and State of Michigan are liable for a breach of implied warranty. According to plaintiffs, these defendants directly or impliedly promised to provide water that was fit for human consumption and later admitted that the water supplied was contaminated and thus not fit for human consumption, in breach of implied warranty. (Dkt. 1 at 71-72.)

Defendants argue that the implied warranty claim must fail, because implied warranty claims exist only under Michigan's version of the UCC and such a contract would be one for services, but the UCC only applies to contracts for goods. Defendants also argue that even if the UCC did apply here, plaintiffs failed to comply with the UCC's notice requirements for bringing an implied warranty claim. (Dkt. 52 at 39.) Plaintiffs implicitly agree, arguing that the state's UCC would never "apply to the supply of public drinking water to consumers." (Dkt. 122 at 45.) And they fail to establish, and do not even argue, that implied warranty claims exist outside the UCC. (*Id.* at 44-46.)

"Warranties of merchantability and fitness for a particular purpose are, by their nature, inapposite to a contract for services like that at issue

here." *De Valerio v. Vic Tanny Int'l*, 140 Mich. App. 176, 180 (1984). Plaintiffs could not provide, in their briefs or at the hearing, and the Court could not independently find, any Michigan case law in which implied warranty claims were adjudicated as to contracts for services. Because breach of implied warranty claims exist only under the Michigan UCC, and the alleged contract here (which, as set forth above, does not actually exist) would be one for services and not goods for which the state's UCC is inapplicable, plaintiffs' breach of implied warranty claim is dismissed.

### iv. Nuisance

Plaintiffs allege that all defendants are liable for nuisance, because they caused lead-contaminated water to be delivered to plaintiffs' homes, which substantially and unreasonably interfered with their comfortable living and ability to use and enjoy their homes. (Dkt. 1 at 72-73.)

As noted above, all of the governmental defendants are entitled to immunity from state tort liability. That leaves the private defendants. Defendants Veolia and Lockwood argue that the claim fails because they did not control the nuisance. (Dkts. 50 at 14-16, 59 at 19-22.)

To plead a private nuisance claim in Michigan (plaintiffs only respond to the motions to dismiss as to private nuisance, so we need not address public nuisance claims), plaintiffs must show that defendants committed "a nontrespassory invasion of [their] interest in the private use and enjoyment of land." *Adkins v. Thomas Solvent Co.*, 440 Mich. 293, 302 (1992). Plaintiffs must show that defendants were "in control, either through ownership or otherwise," which "must be something more than merely issuing a permit or regulating activity on the property which gives rise to the nuisance." *McSwain v. Redford Twp.*, 173 Mich. App. 492, 498 (1988). Put differently, Michigan courts do not impose liability when a "defendant has not either created the nuisance, owned or controlled the property from which the nuisance arose, or employed another to do work which he knows is likely to create a nuisance." *Id.* at 499.

Plaintiffs argue that "control" is satisfied because defendants Veolia and Lockwood had the "power to prevent the injury." (Dkt. 117 at 22.) But the case cited by plaintiffs for this proposition—a defective premises case—holds that the "power to prevent the injury . . . rests primarily upon him who has control and possession" of the premises.

*Sholberg v. Truman*, 496 Mich. 1, 10-11 (2014). Plaintiffs' argument assumes the conclusion. To plead their claim, plaintiffs are required to sufficiently allege that Veolia or Lockwood had sufficient control and possession of the premises to establish that either had the power to prevent the injury.

Plaintiffs plead that Lockwood, "an engineering firm, was hired to prepare Flint's water treatment plant for the treatment of new water sources." According to plaintiffs, they were "responsible for providing engineering services to make Flint's inactive water treatment plant sufficient to treat water from each of its new sources." Plaintiffs elsewhere note that Lockwood was "the consultant." (Dkt. 1 at 21.)

Plaintiffs plead that Veolia "was hired to conduct a review of the City's water quality, largely in response to citizen complaints." Veolia's "task was to review Flint's public water system, including treatment processes, maintenance procedures, and actions taken." According to plaintiffs, "Veolia had an opportunity to catch what [d]efendant [Lockwood] had missed or refused to warn about." However, Veolia concluded that the water was "in compliance with . . . state and federal standards and required testing." (*Id.* at 31.)

Because control under Michigan law "must be something more than merely issuing a permit or regulating activity on the property," see *McSwain*, 173 Mich. App. at 498, defendants Veolia and Lockwood, in their role as consultants and advisors, cannot be held liable for the alleged nuisance. Their "control" is even less than that of a regulating or permit-granting authority. Moreover, plaintiffs plead that defendant MDEQ was "Flint's 'primacy agency,'" and thus "responsible for ensuring that Flint set water quality standards and properly treated its water" (Dkt. 1 at 25), further undercutting their argument that defendants Veolia and Lockwood were in control of the nuisance. The claim is therefore dismissed.

### v. Trespass

Plaintiffs allege that all defendants are liable for trespass, because they willfully caused contaminants to enter plaintiffs' property and plaintiffs' bodies. (Dkt. 1 at 74.) Again, because the governmental defendants are immune from state tort liability, this claim remains only as to defendants Veolia and Lockwood. Defendants Veolia and Lockwood argue that the claim fails because they did not intentionally invade plaintiffs' land with a tangible object. (*See* Dkts. 50 at 16, 59 at 22.)

In Michigan, "claims of trespass and nuisance are difficult to distinguish and include overlapping concepts." *Traver Lakes Cmty. Maint. Ass'n v. Douglas Co.*, 224 Mich. App. 335, 344 (1997). But Michigan courts have "recognized a desire to 'preserve the separate identities of trespass and nuisance," *Wiggins v. City of Burton*, 291 Mich. App. 532, 555 (2011), and thus trespass requires "proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession." *Adams v. Cleveland-Cliffs Iron Co.*, 237 Mich. App. 51, 67 (1999). When "the possessor of land is menaced by noise, vibrations, or ambient dust, smoke, soot, or fumes, the possessory interest implicated is that of use and enjoyment, not exclusion, and the vehicle through which a plaintiff normally should seek a remedy is the doctrine of nuisance." *Id.*

Put differently, although the intrusion of particulate matter may give rise to a claim of nuisance, the "tangible object" requirement for trespass is not met by such intrusion. *Id.* at 69. This is so because particulate matter "simply become[s] a part of the ambient circumstances of th[e] space." *Id.* Plaintiffs argue that they are permitted to plead in the alternative, and defendants actions "either constitute[] a nuisance or

trespass." (Dkt. 117 at 23.) But for different reasons, plaintiffs fail to plead either.

Even if particulate matter were sufficient to satisfy the tangible object requirement to plead a trespass in Michigan, plaintiffs fail to plead that Veolia and Lockwood *intended* for the particulate matter to invade plaintiffs' property. "Trespass is an intentional tort, meaning it is based on an intentional act," specifically requiring "an intentional and unauthorized invasion." *Swiderski v. Comcast Cablevision of Shelby, Inc.*, No. 227194, 2002 Mich. App. LEXIS 806, at *8 (Mich. Ct. App. June 4, 2002). For these reasons, plaintiffs' claim of trespass is dismissed.

### vi. Unjust enrichment

Plaintiffs allege that defendants City of Flint and State of Michigan received the benefits of funds paid by plaintiffs for water, that they utilized these funds for the government, and that retaining the benefit of these funds would be unjust. (Dkt. 1 at 75.)

Defendant City of Flint argues that an unjust enrichment claim is a tort claim, and thus governmental immunity applies. (Dkt. 52 at 46.) Defendant cites one case in which the Michigan Court of Appeals characterizes tort claims to include "common law misappropriation and

unjust enrichment." *See Polytorx v. Univ. of Mich. Regents*, Nos. 318151, 320989, 2015 Mich. App. LEXIS 939, at \*19 (Mich. Ct. App. May 7, 2015). But that case was about the statute of limitations. *Id.* (holding that there is a three-year statute of limitations); *see, e.g.*, *Trudel v. City of Allen Park*, Nos. 304507, 304567, 312351, 2013 Mich. App. LEXIS 1855, at \*49 (Mich. Ct. App. Nov. 14, 2013) (citing MICH. COMP. LAWS § 600.5813).

The Michigan Supreme Court has held that "'tort liability' as used in [MICH. COMP. LAWS §] 691.1407(1) encompasses all legal responsibility arising from noncontractual civil wrongs for which a remedy may be obtained in the form of compensatory damages." *Mick v. Kent Cty. Sheriff's Dep't (In re Estate of Bradley)*, 494 Mich. 367, 397 (2013); *see id.* at 409 (McCormack, J., dissenting) ("[U]njust enrichment . . . . is based on principles of equity; it sounds in neither contract nor tort, yet it shares characteristics of both."). And unjust enrichment claims are equitable claims only available when there is no express contract. But plaintiffs could not identify, and this Court could not independently find, any case in which Michigan statutory immunity was extended to state actors for claims of unjust enrichment.

Whether the governmental defendants are entitled to immunity from unjust enrichment claims is a complicated and unsettled area of state law. Accordingly, the Court declines to exercise jurisdiction over this claim. 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the claim raises a novel or complex issue of State law."); *see, e.g.*, *Arrington v. City of Raleigh*, 369 F. App'x 420, 423 (4th Cir. 2010) (district court abused discretion by retaining jurisdiction over claim involving "state law immunity issues [that] are both novel and complex").

### vii. Negligence/professional negligence/gross negligence against defendant Veolia

Plaintiffs allege that defendant Veolia, by agreeing to work for defendant City of Flint on the switch from the Detroit River to the Flint River as its municipal water source, undertook a duty to plaintiffs and carelessly and negligently caused plaintiffs' harm. (Dkt. 1 at 75-76.)

Defendant Veolia argues that there is no independent cause of action for gross negligence in Michigan, and ordinary negligence claims cannot be brought against Veolia as professionals, thus only the professional negligence claim is proper. (Dkt. 50 at 20.) Veolia does not

argue that the professional negligence claim should be dismissed as a matter of law.

Defendant Veolia is correct that "gross negligence is not an independent cause of action under Michigan law." *Buckner v. Roy*, No. 15-cv-10441, 2015 U.S. Dist. LEXIS 108371, at *23 (E.D. Mich. Aug. 18, 2015). Plaintiffs do not adequately address Veolia's argument that gross negligence is used as a standard in certain types of claims rather than an independent cause of action, instead stating in conclusory terms that they have sufficiently alleged an action for gross negligence. (*See* Dkt. 117 at 19.)

In Michigan, gross negligence is used as a standard for a plaintiff's tort claim to proceed against a defendant with whom the plaintiff has signed a waiver of liability. *See Xu v. Gay*, 257 Mich. App. 263, 269 (2003) ("A contractual waiver of liability also serves to insulate against ordinary negligence, but not gross negligence."). The case plaintiffs cite to support their argument that gross negligence is an independent claim is merely an application of this principal. *See Sa v. Red Frog Events, LLC*, 979 F. Supp. 2d 767, 778-79 (E.D. Mich. 2013) (waiver of liability did not apply because plaintiff adequately pleaded gross negligence). Because gross

negligence is not an independent cause of action in Michigan, the claim is dismissed.

As to ordinary negligence, Veolia argues that because plaintiffs' claim arises from actions taken in "the course of a professional relationship" and raises questions of its professional judgment "beyond the realm of common knowledge and experience," the claim is one of professional negligence. (Dkt. 50 at 20-21 (citations omitted).) According to Veolia, the ordinary negligence claim is precluded because Veolia is sued as a water treatment professional. (*Id.* at 21.) Veolia quotes plaintiffs' allegations, which identify Veolia as a "professional engineering service[]" that was required to "exercise independent judgment . . . in according with sound professional practices." (*Id.* at 22.)

Plaintiffs respond that they have plausibly alleged that Veolia violated both standards of care—that of a reasonable person and that of a reasonable professional—and thus both claims should remain. (Dkt. 117 at 20-21.)

The cases Veolia cites are generally medical malpractice cases, which are distinct from plaintiffs' negligence claim here. In Michigan, malpractice actions do not include actions against engineers. *Nat'l Sand,*

*Inc. v. Nagel Constr., Inc.*, 182 Mich. App. 327, 340 (1990).  Rather, even assuming a "malpractice" action could be brought against an engineer, it would simply mean that ordinary "negligence by an engineer is malpractice," not "that an action against engineer is a malpractice action."  *Id.* at 339; *see, e.g.*, *Bacco Constr. Co. v. Am. Colloid Co.*, 148 Mich. App. 397, 416 (1986) (sustaining ordinary negligence action against engineer for harm caused by miscalculations).

The professional negligence claim is dismissed.  Because Veolia does not argue that plaintiffs otherwise fail to sufficiently plead an ordinary negligence claim, the claim survives.

### viii.  Negligence/professional negligence/gross negligence against defendant Lockwood

Plaintiffs make the same negligence/professional negligence/gross negligence claims against defendant Lockwood as they make against defendant Veolia, and defendant Lockwood makes similar arguments as those made by defendant Veolia in its motion to dismiss.  (*See* Dkt. 59 at 25-26.)  For the same reasons as those set forth above, the professional negligence and gross negligence claims are dismissed but the ordinary negligence claim survives.

### ix.  Punitive damages/joint and several liability

Defendants Veolia and Lockwood argue that punitive damages are not recoverable in Michigan unless authorized by statute, which is not the case here, and thus plaintiffs' request for such damages must be barred.  (Dkts. 50 at 20, 59 at 26.)  Plaintiffs respond indirectly, arguing that exemplary damages are permitted.  (Dkts. 50 at 24-25, 59 at 20-21.)

Punitive damages "are generally not recoverable in Michigan" with the exception of when "they are expressly authorized by statute."  *Casey v. Auto Owners Ins. Co.*, 273 Mich. App. 388, 400 (2006).  And when a plaintiff does not identify "any statute that would grant them punitive damages," dismissal of a request for punitive damages is proper.  *Id.*  Plaintiffs do not do so here, so their request for punitive damages is dismissed.

Plaintiffs are correct, though, as to exemplary damages; "exemplary damages are distinct from punitive damages and are designed to compensate plaintiffs for humiliation, outrage, and indignity resulting from a defendant's wilful, wanton, or malicious conduct."  *Fellows v. Superior Prods. Co.*, 201 Mich. App. 155, 158 (1993) (quotations omitted).  Rather than punishment for bad acts, for which punitive damages are

awarded, exemplary damages are intended to compensate for emotional harms that are not adequately compensated by pecuniary or compensatory damages. *Id.* Although the punitive damages request should be dismissed, plaintiffs may be entitled to exemplary damages. Their request for exemplary damages may proceed.

Defendant Veolia also argues that plaintiffs cannot recover joint-and-several liability in Michigan. (Dkt. 50 at 27.) Michigan has replaced joint-and-several liability with fair-share liability. *See Smiley v. Corrigan*, 248 Mich. App. 51, 55 (2001). Plaintiffs concede the point. (Dkt. 117 at 12.) Thus, any claim for joint-and-several liability is dismissed.

## IV. Conclusion

For the reasons set forth above, the motions to dismiss (Dkts. 50, 52, 59, 69, 70, 96, 102, 103, 105) are each GRANTED IN PART and DENIED IN PART.

Plaintiffs' Counts 1 (substantive due process property claim), 2 (procedural due process property claim), 3 (substantive due process state-created danger claim), 5 (breach of contract claim), 6 (breach of implied warranty claim), 7 (nuisance claim), 8 (trespass claim), 12 (gross

negligence claim), 13 (IIED claim), and 14 (NIED claim) are DISMISSED WITH PREJUDICE.

Plaintiffs' Count 4 (substantive due process bodily integrity claim) is DISMISSED WITH PREJUDICE as to defendants Shekter Smith, Busch, Prysby, Wurfel, Wells, Lyon, and Peeler in their official capacities. Count 4 is DISMISSED WITH PREJUDICE as to defendants State of Michigan, MDHHS, MDEQ, Snyder, Cook, and Glasgow in its entirety.

The Court declines to exercise supplemental jurisdiction over Count 9 (unjust enrichment claim), so it is DISMISSED WITHOUT PREJUDICE.

Plaintiffs' Counts 10 and 11 (professional negligence and gross negligence claims) are DISMISSED WITH PREJUDICE.

Plaintiffs' Count 15 (proprietary function claim) is not an independent cause of action, and so is DISMISSED WITH PREJUDICE.

Accordingly, plaintiffs' Count 4 (substantive due process bodily integrity claim) may proceed against defendants City of Flint, Earley, Ambrose, Wyant, and Croft, and defendants Shekter Smith, Busch, Prysby, Wurfel, Wells, Lyon, and Peeler in their individual capacities.

Plaintiffs' Counts 10 and 11 (ordinary negligence claims) may proceed against defendants Veolia and Lockwood, respectively.

IT IS SO ORDERED.

Dated: June 5, 2017          s/Judith E. Levy
Ann Arbor, Michigan       JUDITH E. LEVY
                                United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 5, 2017.

                          s/Felicia M. Moses
                          FELICIA M. MOSES
                          Case Manager